UNITED STATES of America, Appellee,

v.

Rocco FRUMENTO et al.

In re Subpoena to Vito N. PISCIOTTA, Appellant.

No. 76–1251.

United States Court of Appeals, Third Circuit.

Argued March 23, 1976.

Reargued Nov. 4, 1976.

Decided March 7, 1977.

As Amended March 18, 1977.

OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal requires us to determine whether a defendant who has been tried and convicted but not yet sentenced, and whose post-trial motions were still pending at the time the government sought his testimony at the trial of his codefendants, may be compelled to testify under a grant of immunity. Upon his refusal to testify, the district court entered an order of contempt and confinement pursuant to 28 U.S.C. § 1826. Although the government contends that the termination of the trial at which he was to testify renders this appeal moot, we disagree. Nevertheless, we hold that Pisciotta's trial testimony could be compelled. We therefore affirm the order of contempt and confinement.

## I.

Vito N. Pisciotta was one of five defendants indicted for violation 18 U.S.C. § 1962 (racketeering) and 26 U.S.C. § 7206(1) (submitting false income tax returns). Three separate jury trials were scheduled. Pisciotta's trial was severed from the trial of his codefendants, and he was tried to a jury and convicted on November 22, 1975.

Another defendant (Collitt) was tried separately and acquitted. The trial of the three remaining defendants, Frumento, Millhouse and Sills commenced March 1, 1976. Pisciotta, who at that time had not been sentenced and whose post-trial motions were still pending, was subpoenaed by the government to testify on March 3, 1976 at the trial of his three codefendants. After his motion to quash the subpoena was denied, Pisciotta invoked his Fifth Amendment privilege and refused to testify. The district court, on motion of the government, thereupon granted Pisciotta immunity under 18 U.S.C. § 6002 [1] and directed him to answer. Pisciotta, after consulting with his

David W. Marston, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Division, Philadelphia, Pa., for appellee.

A. Charles Peruto, Burton A. Rose, Philadelphia, Pa., for appellant, Vito N. Pisciotta.

Argued March 23, 1976

Before SEITZ, Chief Judge, and ROSENN and GARTH, Circuit Judges.

Reargued Nov. 4, 1976

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

1. 18 U.S.C. § 6002 provides:
   § 6002. *Immunity generally*
   Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
   (1) a court or grand jury of the United States,

attorney, still refused to answer the questions put to him. Upon his continued refusal, the district court found Pisciotta in contempt under 28 U.S.C. § 1826(a)[2] and ordered him confined in the custody of the United States Marshal until the proceedings terminated or until he purged himself of the contempt by complying with the court's order.

Pisciotta immediately applied for a stay of the March 3, 1976 order of confinement. His application was denied. He then filed a notice of appeal and sought a stay of custody pending the outcome of his appeal from the district court's order. A panel of this Court denied that motion for stay by an order dated March 3, 1976. Pisciotta sought review of that decision. The panel, treating his "Motion for Review" as a request for panel reconsideration, denied his motion on March 4, 1976. Finally, Pisciotta sought review by the court *in banc.*

While Pisciotta's motion for *in banc* consideration, along with his direct appeal of the district court's March 3, 1976 order, was before this Court, the trial of Pisciotta's former codefendants ended.[3] Therefore, on March 23, 1976, the Court, acting *in banc,*

dismissed as moot the motion for a stay of custody. Thus only the direct appeal remained.

The end of the trial of Pisciotta's codefendants and Pisciotta's consequent release from custody (*see* 28 U.S.C. § 1826(a)(1), note 2 *supra*) prompted the panel hearing Pisciotta's direct appeal to require briefing on the issue of mootness. The direct appeal was argued to the panel on March 23, 1976. Subsequently, and before filing of the panel opinion, it was ordered pursuant to this Court's Internal Operating Procedure N. 4 that the case be listed for rehearing *in banc.*[4]

## II.

The government has contended that the appeal from the district court's order of March 3, 1976 which adjudicated Pisciotta to be in contempt and which ordered his confinement is now moot because the court proceeding at which he was to testify has terminated and he has been released from custody. We cannot agree.

In *St. Pierre v. United States,* 319 U.S. 41, 42, 63 S.Ct. 910, 911, 87 L.Ed. 1199 (1943) the Court held moot an appeal from

(2) an agency of the United States, or
(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,
and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

2. 28 U.S.C. § 1826 provides:
§ 1826. *Recalcitrant witnesses*
(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until

such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—
(1) the court proceeding, or
(2) the term of the grand jury, including extensions,
before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

.    .    .    .    .

3. On March 15, 1976 a jury in the District Court for the Eastern District of Pennsylvania returned verdicts of guilty on all counts submitted against the three remaining defendants.

4. It was only after *in banc* briefing that Pisciotta's post-trial motions were decided. A detailed statement of the facts giving rise to Pisciotta's conviction and post-trial motions may be found in the district court's unpublished memorandum and order of October 29, 1976 denying these motions. At the time of the *in banc* argument, Pisciotta had yet to be sentenced, and hence no appeal from the underlying conviction could have been perfected.

a conviction for criminal contempt stating that "the case is moot because, after petitioner's service of his sentence and its expiration, there was no longer a subject matter on which the judgment of this Court could operate." While superficially it would appear that this holding controls the present case, the exceptions to the *St. Pierre* mootness rule have, to a large extent, dissipated its vitality.

The Court in *St. Pierre* recognized that the petitioner there could have had his case reviewed before the expiration of his sentence, but no stay or supersedeas had been sought. The Court thereby implied an exception to the mootness rule—that an appeal is not moot even though the appellant has been released from custody or has served his sentence if he has taken all possible steps to have the order of confinement promptly reviewed prior to his release.

In commenting on this aspect of the *St. Pierre* holding, the Supreme Court in *Sibron v. New York*[5] said, "This was a plain recognition of the vital importance of keeping open avenues of judicial review of deprivations of constitutional right." In so stating, the *Sibron* Court recognized the importance of the principle that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review.[6] In *Sibron*, the Court held that petitioner's appeal was not moot even though he had completed service of the six month sentence imposed upon him as a result of

his conviction for possession of drugs. In emphasizing the exception to the *St. Pierre* rule, the Court noted that "there was no way for Sibron to bring his case here [the Supreme Court] before his six month sentence expired . . . despite the fact that he took all steps to perfect his appeal in a prompt, diligent and timely manner." 392 U.S. at 52, 88 S.Ct. at 1897.[7]

Here as we have indicated, Pisciotta immediately sought a stay of the district court's order of March 3, 1976 which directed his confinement. After his district court application had been denied, on the same day he sought a stay from a panel of this Court. When this motion was denied, Pisciotta unsuccessfully sought a stay from the Court *in banc*. Simultaneously, he appealed from the March 3, 1976 order. These "prompt, diligent and timely" actions clearly bring Pisciotta within the reviewability exception to the mootness doctrine of *St. Pierre*.

We recognize that the most traditional of exceptions to the mootness doctrine has been characterized as "capable of repetition yet evading review," *Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *DeFunis v. Odegaard*, 416 U.S. 312, 318, 94 S.Ct. 1704, 40 L.Ed.2d 164, (1974); *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct.

---

**5.** 392 U.S. 40, 51–52, 88 S.Ct. 1889, 1897, 20 L.Ed.2d 917 (1968).

**6.** *See Fay v. Noia*, 372 U.S. 391, 424, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

**7.** The other exception to the *St. Pierre* rule which is made explicit in *Sibron* concerns the collateral legal consequences which flow from the conviction. Our disposition of the mootness issue centers on the "opportunity for review" exception. We therefore do not find it necessary to discuss in detail or rely upon the second exception as it might pertain to Pisciotta.

The collateral legal consequences exception would preclude a court from holding an appeal moot where consequences (such as disbarment, impeachment, loss of political privileges, etc.) flowing from the conviction or order of confine-

ment might be suffered by the appellant after release from custody or service of a sentence. The record before us reveals no such disabling consequences. We note, in passing, however, that Pisciotta, at the time of his indictment, was a Judge of the Court of Common Pleas of Philadelphia County. *Cf. United States v. Schrimsher*, 493 F.2d 842, 844 (5th Cir. 1974) (collateral consequences flowing from holding attorney in criminal contempt); *Jessup v. Clark*, 490 F.2d 1068, 1071 (3d Cir. 1973) (collateral consequences of criminal contempt). *See also In re Ballay*, 157 U.S.App.D.C. 59, 482 F.2d 648 (1973) (civil commitment for mental illness); *Justin v. Jacobs*, 145 U.S.App.D.C. 355, 449 F.2d 1017 (1971) (civil commitment under Sexual Psychopath Act).

2791, 49 L.Ed.2d 683 (1976); *Super Tire Engineering Corp. v. McCorkle,* 416 U.S. 115, 125, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); *Scott v. Kentucky Parole Board,* 429 U.S. 60, 97 S.Ct. 342, 50 L.Ed.2d 218 (1976) (Stevens, J., dissenting). This Court applied that standard, despite its seeming inapplicability, in *United States v. Schiavo,* 504 F.2d 1 (3d Cir.) (*in banc*) *cert. denied,* 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974), where we considered the merits of a press "silence order" although the trial to which the order pertained had been completed. This Court held that the appeal should not be dismissed as moot even though there no longer existed any restraints upon the newspapers and reporter. We said in *Schiavo* that the dispute was "capable of repetition yet evading review" because

> If this case were deemed moot, it is unlikely that members of the press who are subject to a silence order would ever be able to obtain appellate review, since the underlying criminal proceeding would almost always terminate before the appellate court hears the case.

*Id.* at 5.

*Schiavo* reflects an application of the standards of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court's abortion decision, where the Court observed:

> The usual rule in federal cases is that an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated. *United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); *Golden v. Zwickler* [394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113] *supra*; *SEC v. Medical Committee for Human Rights,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972).

> But when, as here, pregnancy is a significant fact in the litigation, the normal 266-day human gestation period is so short that the pregnancy will come to term before the usual appellate process is complete. If that termination makes a case moot, pregnancy litigation seldom will survive much beyond the trial stage, and appellate review will be effectively denied. Our law should not be that rigid. Pregnancy often comes more than once to the same woman, and in the general population, if man is to survive, it will always be with us. Pregnancy provides a classic justification for a conclusion of nonmootness. It truly could be "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). See *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969); *Carroll v. Princess Anne,* 393 U.S. 175, 178–179, 89 S.Ct. 347, 350, 21 L.Ed.2d 325 (1968); *United States v. W. T. Grant Co.,* 345 U.S. 629, 632–633, 73 S.Ct. 894, 897–898, 97 L.Ed. 1303 (1953).

410 U.S. at 125, 93 S.Ct. at 712.

In *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), the Supreme Court rejected the suggestion of mootness despite the fact that the underlying labor dispute giving rise to petitioner's claims had ended by the execution of a new collective bargaining agreement and the return to work of the strikers. Although economic concerns were involved, rather than the personal interest (pregnancy) at stake in *Roe v. Wade,* the Supreme Court applied the same criteria:

> Certainly, the pregnant appellants in *Roe v. Wade, supra,* and in *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), had long since outlasted their pregnancies by the time their cases reached this Court. Yet we had no difficulty in rejecting suggestions of mootness, 410 U.S., at 125, 93 S.Ct., at 712–713 and 187, 93 S.Ct., at 745. Similar and consistent results were reached in *Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282–1283, 39 L.Ed.2d 714 (1974); *Rosario v. Rockefeller,* 410 U.S. 752, 756 n. 5, 93 S.Ct. 1245, 1249, 36 L.Ed.2d 1 1973); *Dunn v. Blumstein,* 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); and *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494–1495, 23 L.Ed.2d 1 (1969), cases concerning various

challenges to state election laws. The important ingredient in these cases was governmental action directly affecting, and continuing to affect, the behavior of citizens in our society.

The issues here are no different. Economic strikes are of comparatively short duration. There are exceptions, of course. See, for example, *Local 833, UAW v. NLRB*, 112 U.S.App.D.C. 107, 300 F.2d 699, cert. denied *sub nom. Kohler Co. v. Local 833, UAW, etc.*, 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962). But the great majority of economic strikes do not last long enough for complete judicial review of the controversies they engender. U.S. Dept. of Labor, Bureau of Labor Statistics, Analysis of Work Stoppages 1971, Table A–3, p. 16 (1973). A strike that lasts six weeks, as this one did, may seem long, but its termination, like pregnancy at nine months and elections spaced at year-long or biennial intervals, should not preclude challenge to state policies that have had their impact and that continue in force, unabated and unreviewed. The judiciary must not close the door to the resolution of the important questions these concrete disputes present.

*Id.* at 126–27, 94 S.Ct. at 1700.

One of the most recent expressions of the Supreme Court in the mootness area is found in *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Petitioners in *Nebraska Press* sought to vacate a court-ordered ban on the publication of information revealed during the pretrial hearings of a murder trial. As Chief Justice Burger observed:

The order at issue in this case expired by its own terms when the jury was impaneled on January 7, 1976. There were no restraints on publication once the jury was selected, and there are now no restrictions on what may be spoken or written about the Simants case.

*Id.* at 546, 96 S.Ct. at 2796. Still the court ruled that the merits would be reached:

Our jurisdiction under Art. III, § 2, of the Constitution extends only to actual cases and controversies. *Indianapolis School Comm'rs v. Jacobs*, 420 U.S. 128, 96 S.Ct. 848, 43 L.Ed.2d 74 (1975); *Sosna v. Iowa*, 419 U.S. 393, 397–403, 95 S.Ct. 553, 556–559, 42 L.Ed.2d 532 (1975). The Court has recognized, however, that jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one "capable of repetition, yet evading review." *Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

The controversy between the parties to this case is "capable of repetition" in two senses. First, if Simants' conviction is reversed by the Nebraska Supreme Court and a new trial ordered, the District Court may enter another restrictive order to prevent a resurgence of prejudicial publicity before Simants' retrial. Second, the State of Nebraska is a party to this case; the Nebraska Supreme Court's decision authorizes state prosecutors to seek restrictive orders in appropriate cases. The dispute between the State and the petitioners who cover events throughout the State is thus "capable of repetition." Yet, if we decline to address the issues in this case on grounds of mootness, the dispute will evade review, or at least considered plenary review in this Court, since these orders are by nature short-lived. See, *e. g.*, *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); *Sosna v. Iowa, supra*; *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); *Moore v. Ogilvie*, 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969); *Carroll v. Princess Anne*, 393 U.S. 175, 178–179, 89 S.Ct. 347, 350, 21 L.Ed.2d 325 (1968). We therefore conclude that this case is not moot, and proceed to the merits.

*Id.*

It is contended that the circumstances giving rise to Pisciotta's confinement and release are not "capable of repetition." If such be the case, then we submit the circumstances giving rise to *Schiavo, Roe v.*

*Wade, McCorkle,* and *Nebraska Press* were equally incapable of repetition. In each instance, the underlying dispute had ended. Just as the trial of Pisciotta's codefendants had concluded, so the pregnancy in *Roe* had terminated; the labor dispute in *McCorkle* had been resolved; and the publicity restraints in *Nebraska Press* had been lifted. Yet in each of these instances the Supreme Court found a capability of repetition and rejected the suggestion of mootness, proceeding to the merits of the controversy.

For example, we perceive no difference between Pisciotta's exposure to future grand jury or court proceedings and the circumstances foreseen by the Supreme Court in *Nebraska Press* in the event a new trial was ordered and a new gag order imposed. Indeed, we need not speculate with respect to Pisciotta's future grand jury involvements, for the government has already subpoenaed Pisciotta once to give grand jury testimony, and has indicated an intention to call him again.[8] Further, we are mindful that appeals may be taken by Pisciotta's codefendants, which may result in new trial proceedings at which Pisciotta's testimony will be required. Hence, the circumstances giving rise to Pisciotta's confinement are at least as "capable of repetition" as those circumstances which have satisfied the Supreme Court's mootness requirements in cases involving other interests.[9]

Even if we could not construct or project any "capability of repetition" in this case, we would nevertheless decline to dismiss Pisciotta's appeal as moot.

While in each of the instances discussed, the Supreme Court has determined that "capability of repetition" existed, we are of the view that such capability was perceived so as to satisfy the true governing consideration behind the Court's decision—that of having review available when significant interests are at stake. We are satisfied that Pisciotta's confinement pursuant to an order of contempt, whether or not it is capable of repetition within the exact same framework, must not escape desired review any more than should "gag orders" where the reason for the "gag" no longer exists; pregnancies, where the pregnancies have terminated; or strikes, where the dispute has been settled. Indeed, conceding the importance of the economic, First Amendment, and personal interests discussed, we believe that even more weighty and deliberate consideration should be given to instances where personal liberty has been deprived. Hence, even if the "capable of repetition" criterion could not be satisfied here,

8. The government subpoena calling Pisciotta to testify before the grand jury was quashed by the district court upon motion by Pisciotta. Although the government appealed the district court's action, *Pisciotta v. United States,* No. 76–1275 (3d Cir. July 22, 1976), this Court granted the government's own motion to dismiss the appeal as moot. The government noted its intention to subpoena Pisciotta again in its *in banc* brief, *see* Supplemental Brief for Appellee at 2, and reiterated this intention at oral argument.

9. We do not view the Supreme Court's opinion in *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), as mandating a different conclusion. In *DeFunis* the Court rejected the "capable of repetition yet evading review" exception for two reasons. First, DeFunis, a soon-to-be-graduated law student, could never again be subjected to the alleged discrimination which had denied him admission to law school, since his graduation would assure that he would never again be applying for admission. Second, the Court speculated that

the trail blazed in the lower courts by DeFunis would permit subsequent petitioners suffering the same alleged deprivation to arrive before the Court in a more timely fashion.

Here, in contrast, Pisciotta can—and probably will, *see* note 8 *supra* —be called to testify again, a fact which distinguishes his case from DeFunis'. The second ground in *DeFunis* is equally inapposite: Pisciotta's case reached this Court with dispatch, yet by the time it was argued the trial was completed and his confinement had ended. Nothing in the lower court proceedings here will facilitate review of future confinements of Pisciotta or of anyone else.

Nor does the Supreme Court's recent remand in *Scott v. Kentucky Parole Board,* 429 U.S. 60, 97 S.Ct. 342, 50 L.Ed.2d 218 (1976), control our result. The decision of the *Scott* majority was simply a remand to consider the mootness question; three dissenters, *see id.* at 60–64, 97 S.Ct. at 343–45, would have found nonmootness on the record then before the Court.

we nevertheless could not countenance dismissing Pisciotta's appeal as moot.

We are aware that Pisciotta's confinement resulted from an order of *civil* contempt rather than from *criminal* charges which were the subject of the appeals in both *St. Pierre* and *Sibron*. However, when fundamental personal liberties are at issue and review of an order of confinement as a practical matter is not available, there is little logic and no basis for distinguishing between the character of the underlying events which have caused the defendant to be imprisoned. *Compare Bursey v. United States*, 466 F.2d 1059, 1088–89 (9th Cir. 1972) (appeal from contempt order under 28 U.S.C. § 1826 for refusal to testify before grand jury not moot even though the term of the grand jury expired) *with United States v. Schrimsher*, 493 F.2d 842, 843–44 (5th Cir. 1974) (appeal from criminal contempt order not moot even though confinement for two hours had terminated.).

We reject the government's contention that we may not review the order of March 3, 1976 because of Pisciotta's release from custody, and we hold that the appeal from that order is not moot.

### III.

Pisciotta claims a constitutional right not to testify, despite the grant of immunity.[10] He argues that due regard for his Fifth Amendment rights requires reversal of the district court's order of contempt. He bases his argument on an alleged disparity between the scope of protection guaranteed by the privilege against self-incrimination and that afforded by the immunity provided by 18 U.S.C. § 6002. (*See* note 1 *supra*). We must determine whether § 6002 immunity is coextensive with Pisciotta's Fifth Amendment privilege or whether it results in the dilemma posed by Pisciotta which Pisciotta claims he would not confront if his

Fifth Amendment privilege remained available.

That dilemma, Pisciotta contends, consists of the following: if his testimony is untruthful (*i.e.,* exculpatory as to him), he will be subject to prosecution for perjury; yet, if the testimony is truthful (*i.e.,* inculpatory), it can be used against him to impeach his testimony at any subsequent prosecution. But § 6002 imposes no such dilemma, mandates no such choice, and, as a result, permits no such consequences.

The threat of a perjury prosecution, as it is implicated in half of Pisciotta's supposed dilemma, is real enough. In *United States v. Hockenberry*, 474 F.2d 247 (3d Cir. 1973), this Court held that:

> quite apart from any question of self incrimination, a witness who testifies before a grand jury is required and sworn to tell the truth. The grant of immunity is superimposed upon that requirement. Protection is granted against future injurious use of the incriminating truth that the witness is required to speak, not against prosecution for or the use of any exculpatory falsehood that he may utter to avoid the required admission of wrongdoing. Hence, the immunity statute properly permits prosecution for perjury committed in an otherwise immunized statement and also the introduction in evidence of so much of the statement as is essential to establishing the *corpus delicti*.

*Id.* at 249. This conclusion has recently been echoed by the Court of Appeals for the Seventh Circuit:

> [I]f the witness commits perjury in giving the compelled testimony, the grant of immunity will not protect him from a perjury prosecution since no immunity attaches to false testimony given pursuant to the immunity order.

*United States v. Patrick,* 542 F.2d 381, 385 (7th Cir. 1976).[11] Similarly, the Court of

---

**10.** In this regard, his complaint is similar to that considered and rejected in *In re Liddy*, 165 U.S.App.D.C. 254, 506 F.2d 1293 (1974).

**11.** The *Patrick* court held, however, that inconsistent testimony given under different grants

of immunity could not be the basis of an "inconsistent declaration" prosecution under 18

Appeals for the Second Circuit has stated that "[t]he immunity granted by the Constitution does not confer upon the witness the right to perjure himself or to withhold testimony." *United States v. Tramunti,* 500 F.2d 1334, 1343 (2d Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). *Cf. Glickstein v. United States,* 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128 (1911).

■ We conclude that § 6002 immunity offers the witness the same protection against a prosecution for perjury that the Fifth Amendment would provide—which is to say, none at all. *See In re Bonk,* 527 F.2d 120, 125 (7th Cir. 1975). Pisciotta's fear of a perjury prosecution for any untruthful statements which he might make under oath is thus well-founded.

However, for his "dilemma" to move this Court to rule that § 6002 immunity does not provide the full measure of Fifth Amendment protection, he must demonstrate that his *truthful* immunized statements could be used against him. This he cannot do.

■ Whatever merit Pisciotta's argument may have had prior to 1972[12] was lost when the Supreme Court held in *Kastigar v. United States,* 406 U.S. 441, 462, 92 S.Ct. 1653, 1666, 32 L.Ed.2d 212 (1972), that:

We conclude that the immunity provided by 18 U.S.C. § 6002 leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege. The immunity is therefore

coextensive with the privilege and suffices to supplant it.

*Kastigar* establishes, therefore, that use and derivative use immunity under § 6002 is a satisfactory substitute for the guaranties of the Fifth Amendment. Indeed, the *Kastigar* Court conceded that contumacy would be justified if only a lesser protection was offered, for "[if] the immunity granted is not as comprehensive as the protection afforded by the privilege, petitioners were justified in refusing to answer, and the judgments of contempt must be vacated." *Id.* at 449, 92 S.Ct. at 1659.

■ Here, no one claims that Pisciotta's responses could be used in the government's case in chief against him at a subsequent trial.[13] Clearly, such use would contravene *Kastigar,* and would be exposed in a *Kastigar* hearing.[14] At such a hearing, the burden upon the government to show that its evidence was derived from sources other than the immunized witness's testimony is a heavy one. *Kastigar v. United States, supra,* 406 U.S. at 460, 461, 92 S.Ct. 1653; *Goldberg v. United States,* 472 F.2d 513 (2d Cir. 1973); *In re Minkoff,* 349 F.Supp. 154 (D.R.I.1972).

Pisciotta's fear—a fear which is justified in part in light of the position taken by the government[15]—is that the government could use his immunized testimony for the purpose of impeaching him should be testify in his own defense at a subsequent trial.

However, if the government could use "immunized" testimony in such a fashion,

U.S.C. 1623(c). Introducing two inconsistent immunized statements necessarily implies using the truth of one to prove the falsity of the other—and *truthful* immunized statements cannot be used against the witness who gave them.

**12.** *See United States v. Kelly,* 464 F.2d 709 (5th Cir. 1972), and the discussion in *In re Liddy,* 165 U.S.App.D.C. 254, 506 F.2d 1293, 1302 (1974).

**13.** Indeed, it has recently been held that the use of such immunized testimony is prohibited not merely at trial, but at grand jury proceedings as well. *United States v. Hinton,* 543 F.2d 1002, 1008–09 (2d Cir. 1976).

**14.** Such a hearing is most commonly held before trial, *see, e.g., United States v. Kurzer,* 534 F.2d 511, 514–17 (2d Cir. 1976), although it seems clear that a determination of whether the prosecution's evidence has been tainted may also be made when the evidence is offered or at a post-trial hearing. *See United States v. DeDiego,* 167 U.S.App.D.C. 252, 511 F.2d 818 (1975).

**15.** The government posits that "a court could, for example, decide that [*United States v. Hockenberry,* 474 F.2d 247 (3d Cir. 1973)] would not control where the immunized testimony was in direct conflict with the witness' testimony at trial." Supplemental Brief for Appellee at 4 n.1.

the point would be reached where a witness could, under *Kastigar,* have "just cause" to refuse to answer. Clearly, if a witness had invoked his Fifth Amendment privilege, the government could have no testimony available with which it might impeach his subsequent sworn statements. Were we to permit impeachment with immunized testimony, we would then be affording the immunized witness something less than his full Fifth Amendment protection.

In *United States v. Hockenberry,* 474 F.2d 247 (3d Cir. 1973), the government urged this Court to adopt a rule permitting the use of immunized testimony "for the purpose of impeaching the immunized witness or an immunized defendant when . . . he chooses to testify on his own behalf." *Id.* at 249 n.1. We responded that

> to argue . . . that the immunity statute allows the use of any truthful admission of wrongdoing made in an immunized statement to discredit the individual as a witness in a subsequent prosecution, so narrows the statutory grant of immunity as to jeopardize its adequacy as a constitutional means of requiring self incrimination. But for the grant of immunity Hockenberry would have been privileged to refuse to admit to the grand jury his wrongdoing in the execution of affidavits to obtain search warrants. And if immunity that deprived him of that privilege is to be, as constitutionally it must, co-extensive with the privilege itself, his compelled admission of wrongdoing cannot later be used to discredit his effort to defend himself against a charge of some other wrongdoing. 'Immunity from the use of compelled testimony . . . prohibits the prosecutorial authorities from using the compelled testi-

mony in *any* respect . . . .' Powell, J., in *Kastigar v. United States, supra.*

474 F.2d at 249–50.

■ We reiterate our adherence to this principle; except as the basis for a prosecution for perjury a witness's immunized testimony may not be used against him.[16]

Finally, we note, as we did in *Hockenberry,*[17] that *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), does not bear upon this discussion. *Harris* held that statements inadmissible in the government's case in chief because of *Miranda* deficiencies could be used to impeach. *Harris* does not govern the use of statements obtained through a grant of immunity.

Statements obtained under a grant of immunity are compelled—in essence, coerced. The compulsion, which under other circumstances would amount to a violation of Fifth Amendment rights, is permitted because of the substitution of use and derivative use immunity.

*Harris* offers no such safeguards, and is thus restricted to cases where coercion is not a factor. The *Harris* Court qualified its rule permitting impeachment as follows: "Petitioner makes no claim that the statements made to the police were coerced or involuntary." 401 U.S. at 224, 91 S.Ct. at 645. We cannot conceive of any instance in which a witness given immunity could not claim that his testimony is both coerced and involuntary. The *Harris* rule, therefore, does not govern the use of such testimony.

## IV.

Pisciotta's dilemma, then, is illusory. His testimony could be used against him only in the event of a prosecution for perjury, but in no other way and for no other reason.

---

**16.** Pisciotta argues that the Second Circuit's decision in *United States v. Tramunti,* 500 F.2d 1334 (2d Cir. 1974), raises the spectre that immunized testimony might be used against him. We disagree. We read *Tramunti* as embracing the principle that while truthful testimony can have no subsequent use under a grant of immunity, *untruthful* testimony is unprotected. That same principle was announced by this Court in *Hockenberry,* and is endorsed

here. We decline to draw any further implications from *Tramunti,* as much of the ensuing discussion in that case came in response to the singular circumstances arising there from a discovery, made only after trial had been completed, that the grand jury testimony employed at trial had been given under a grant of immunity. *See* 500 F.2d at 1344–46.

**17.** *See* 474 F.2d at 250.

Pisciotta is fully protected by § 6002 immunity from having any truthful testimony he may give—even though inculpatory—used against him.

◼ Under such circumstances the district court properly ordered Pisciotta to testify after a grant of immunity, and on his refusal to testify, properly ordered him held in contempt and confined. We think the actions of the district court and the entry of its orders of March 3, 1976 were fully justified. *Kastigar v. United States, supra.*

Having concluded that the immunity granted to Pisciotta under 18 U.S.C. § 6002 afforded him protection coextensive and commensurate with his Fifth Amendment privilege and that the actions of the district court in confining Pisciotta were properly taken, we will affirm the district court's order of March 3, 1976.

ROSENN, Circuit Judge, concurring.

I concur in the opinion of the majority, with the exception of the dictum that incapability of repetition would not render this appeal moot. *See* majority op. at 540–541.

As Judge Garth demonstrates, the circumstances giving rise to Pisciotta's confinement and release are indeed capable of repetition; consequently, this case falls within a well-established exception to general principles of mootness. Therefore, there would appear to be no need for the gratuitous assertion that, even if the circumstances underlying this case were incapable of repetition, the appeal would not be moot because the significance of the interests at stake is itself enough to permit review. Whether the presence of important interests obviates a showing of capability of repetition for purposes of mootness analysis is a troublesome question that should be addressed only in the context of a case squarely presenting that issue.

ADAMS, Circuit Judge, joins in this opinion.

JAMES HUNTER, III, Circuit Judge, concurring:

I concur in the majority's affirmance of the district court's order of contempt and confinement. I concur also in Part II of the majority opinion to the extent that it finds the legality of Pisciotta's confinement justiciable; persons in Pisciotta's position can, I think, present problems "capable of repetition, yet evading review." I do not believe, however, that in reviewing the legality of Pisciotta's confinement it is either necessary or proper for this court to decide the question of statutory and constitutional[1] interpretation that Pisciotta raises. I would affirm the order of the court below simply because neither here nor in the district court did Pisciotta raise any legal issue that could have had any bearing on the legality of his refusal to testify; that refusal, remaining legally unjustified, was therefore punishable by a contempt order.

By claiming that his uncertainty about the meaning of section 6002 with respect to future impeachment uses justified his refusal to testify, Pisciotta in effect asks this court to render an advisory opinion: no matter how we resolve the statutory and constitutional question Pisciotta raises, our resolution can have no impact on the outcome of the only issue before us, which is the legality of Pisciotta's refusal to testify. That is, if we follow the excellent (but, I think, abstract) analysis of the majority opinion and hold that section 6002 forbids future impeachment uses, then we must conclude that Pisciotta had no fifth amendment claim at all; therefore, his refusal to testify was illegal. If, on the other hand, we hold that section 6002 and the fifth amendment permit future impeachment uses, then again we must conclude that Pisciotta had no fifth amendment claim and that his refusal to testify was illegal. In short, diametrically opposed results on the merits of the statutory and constitutional question raised by Pisciotta would not dif-

---

1. The majority interprets § 6002 to preclude future impeachment uses of immunized testimony, but it does so because of its conclusion that the fifth amendment requires that statutory reading.

fer in their effect upon his rights in this case.[2]

The only possible conclusion, then, is that Pisciotta has failed to raise any legal argument that has any bearing on the decision of the issue before us—the legality of his refusal to testify. That failure leaves his refusal unjustified and therefore punishable. It is unnecessary for us to decide the irrelevant issue that Pisciotta did raise; indeed, because it entails the rendering of an advisory opinion, decision of that issue is improper. *See, e.g., Local No. 8–6, Oil Workers Unions v. Missouri,* 361 U.S. 363, 371, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960) (issue not properly justiciable where decision either way cannot effect rights of parties).

Moreover, even if the argument raised by Pisciotta could in some abstruse way be considered part of this case, it could in no sense be considered ripe for judicial resolution. Whether Pisciotta wins a retrial, whether he will testify at that retrial, whether that testimony will diverge from the inculpatory, immunized testimony he apparently would have given at his confederates' trial and—ultimately—whether the Government would have attempted to introduce that immunized testimony to impeach him at his retrial, were all conjectural matters when Pisciotta refused to testify. They remain conjectural. I see no reason to decide the statutory and constitutional question until the occurrence of those contingencies renders its resolution necessary to the disposition of a case. *See, e.g.,* 13 C. Wright § A. Miller, *Federal Practice & Procedure* § 3532 (1975). Had Pisciotta testified as ordered, and had the Government later attempted to impeach him with the compelled testimony, the decision of the statutory and constitutional question he raises here would, of course, have been essential to the disposition of his objection to the Government's action. Until such a case

is presented, the question raised here will not be ripe.

**2.** I can envision only one alternative to this view. If we were to hold that § 6002 permitted future impeachment uses but violated the fifth amendment for that reason, then Pisciotta's refusal to testify would have had a valid grounding in the fifth amendment. This possi-

bility seems foreclosed, however, by the holding, in *Kastigar v. United States,* 406 U.S. 441, 462, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), that the protections of § 6002 are congruent with those of the fifth amendment.