**UNITED STATES of America**

v.

**Albert C. PANTONE, Appellant.**

**UNITED STATES of America**

v.

**John KUMER, Appellant.**

**Nos. 79–2840, 79–2841.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 18, 1980.

Decided Nov. 5, 1980.

Robert J. Cindrich, U. S. Atty., Sandra D. Jordan (argued), Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Donald D. Rossetti (argued), Pittsburgh, Pa., for appellant in No. 79–2840.

Thomas A. Livingston (argued), Livingston, Miller, O'Malley & Clark, Pittsburgh, Pa., for appellant in No. 79–2841.

Before ADAMS, HUNTER and HIGGINBOTHAM, Circuit Judges.

OPINION OF THE COURT

ADAMS, Circuit Judge.

The principal issue presented on this appeal is whether a prosecutor's knowledge of immunized grand jury testimony, obtained after a first trial conviction but prior to a remand and a second trial, tainted the second trial in violation of *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

*FACTS*

In these consolidated cases, Albert Pantone and John Kumer, former state court magistrates serving in Pittsburgh, appeal from judgments of sentence imposed following a second jury conviction of (1) a conspiracy to participate in a bribery scheme, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), and of (2) the underlying substantive offense, defined by 18 U.S.C. §§ 1961, 1962(c) and 1963.

The government's chief witness was Stephen Levitt, who had pleaded guilty to a violation of 18 U.S.C. § 1962(d). Levitt testified that he operated a bail bond agency in Pittsburgh from February 1970 through May 1975, writing surety bonds for persons charged with crimes in Western Pennsylvania. Early in 1970 he made arrangements with various magistrates to pay a fifty percent kickback of the surety bond premium, if they referred bond business to Levitt's new agency. Levitt usually posted an invalid bond–either a worthless property bond or a surety bond without an appropriate power of attorney–for persons referred to him at the time of arraignment. By means of such an arrangement, Levitt avoided making any premium payment to Stuyvesant Insurance Company, the principal surety. Inherently, this scheme encouraged the magistrate to require a surety bond at an amount as high as but no higher than the accused party could afford. The magistrate and Levitt benefitted from the dismissal of cases, for the cost of a valid power of attorney, which was required if the case was held for trial, was thereby

eliminated. Also, surreptitious reductions of bonds were made without any refund to bond clients, a procedure that enabled Levitt and the magistrates to obtain an extra profit. Levitt testified to the regular payment of kickbacks in the form of cash payments placed in envelopes that were delivered by him to the magistrates. On occasions when Levitt did not personally pay the magistrate, envelopes containing cash were delivered by his employees or picked up by the magistrates.

We are already familiar with appellants Kumer and Pantone. On an earlier appeal, the Court reversed the grant of motions by the district court to suppress evidence and to dismiss indictments that were pending against them. *United States v. Forsythe*, 560 F.2d 1127 (3d Cir. 1977). Also, after the original trial ended with a jury verdict against Kumer and Pantone and their co-defendants, we concluded on appeal that the erroneous admission of rebuttal testimony required a reversal, vacation of judgment, and remand for a new trial. *United States v. Pantone*, 609 F.2d 675 (3d Cir. 1979).

Central to the present appeal is the fact that prior to the remand, Pantone gave immunized testimony before a grand jury under a court order compelling testimony in accordance with 18 U.S.C. § 6002. Pursuant to the grant of immunity, Pantone, on May 10, 1979, testified that he had performed extra justice–of–the–peace work for Paul Landau, head of the Pennsylvania Cigarette & Beverage Tax Bureau. Although Pantone's relationship with Landau was entirely independent of his connections with Levitt, the service rendered at the request of Landau was subject to a bond–splitting arrangement somewhat analogous to that in issue in the instant appeal.

Before the second trial, Pantone moved to dismiss the indictment or in the alternative, to disqualify the United States Attorney who had prosecuted the first trial, conducted the grand jury proceedings at which Pantone testified under an immunity grant, and was scheduled to prosecute the retrial. Following a full hearing, the district court

denied the motion. The second jury trial began on December 3, 1979, and it is from the second guilty verdict returned on both RICO counts that Kumer and Pantone now appeal. We affirm.

*DISCUSSION*

These appeals present several issues which we have addressed in previous related proceedings. The claim that the evidence relative to the bribery element of the offense was insufficient to support a guilty verdict was examined and found without merit in *United States v. McCann, (United States v. Herman)*, 589 F.2d 1191 (3d Cir. 1978) and *United States v. Pantone*, 609 F.2d 675 (3d Cir. 1979). Similarly, appellants' contention that the district court erred in refusing to instruct the jury on a lesser included state law misdemeanor offense was held to lack validity in *United States v. Forsythe*, 594 F.2d 947 (3d Cir. 1979), a case which explicitly noted that a state law felony is a necessary predicate for a RICO violation. In addition, we now conclude that appellants' assertion of a statutory and constitutional violation of their speedy trial rights is lacking in merit.

It is appropriate, we believe, to address the *Kastigar* question, which applies only to Pantone's appeal, in some detail inasmuch as the precise issue presented here has not yet been dealt with by this Court. Pantone claims that the participation by the United States Attorney in the grand jury proceedings at which Pantone gave compelled testimony and the same Attorney's subsequent prosecution of Pantone at the retrial inevitably resulted in an indirect, subjective use of the immunized testimony in violation of *Kastigar's* "sweeping proscription of any use, direct or indirect, of the compelled testimony and information derived therefrom." *Kastigar v. United States*, 406 U.S. 441, 460, 92 S.Ct. 1653, 1664, 32 L.Ed.2d 212 (1972). Pantone admits that the government did not make any direct use of the grand jury testimony. Instead, he contends that the prosecutor's mere exposure to compelled testimony renders virtually impossible a showing by the government of the absence of indirect use of the testimony.

In essence, Pantone argues for the creation of a per se rule, which would require the withdrawal of a prosecutor who may be privy to compelled testimony.

Immunity statutes have deep historical roots in Anglo–American jurisprudence and have been accepted as "part of our constitutional fabric."[1] They seek to preserve the delicate balance between the privilege against compulsory self–incrimination and the government's recognized power to compel testimony–a traditional source of information in an ordered society[2] and an essential tool in the effective enforcement of criminal laws.[3] Prior to Kastigar, federal immunity statutes conferred on immunized witnesses a broad transactional immunity, that is, full immunity from prosecution for the offense to which the compelled testimony relates. The scope of transactional immunity was based on the reasoning, as further explicated in the 1892 Supreme Court Counselman decision, that in order to supplant effectively the Fifth Amendment privilege, a statute "to be valid, must afford absolute immunity against future prosecution for the offense to which the [criminating] question relates." Counselman v. Hitchcock, 142 U.S. 547, 586, 12 S.Ct. 195, 206, 35 L.Ed. 1110 (1892). In Kastigar, however, the Court held that a grant of immunity which accorded protection commensurate with that afforded by the constitutional privilege was more accurately delineated by the concept of use and derivative use. Kastigar therefore placed a substantial burden on the government to legitimate its proffered evidence, whenever a witness demonstrates that he has testified under an immunity grant. It has been left to the lower courts to define the exact contours of the standards that the government must meet in varying contexts before evidence will be deemed untainted by association with compelled testimony.

■ The government acknowledges that in order to insure that use and derivative use immunity is co–extensive with the Fifth Amendment privilege against self–incrimination Kastigar established a high standard of proof. It further concedes that such a test requires a prosecutor to demonstrate that any evidence proposed for use at trial be derived from a source wholly independent of the compelled testimony. Kastigar v. United States, 406 U.S. at 461, 92 S.Ct. at 1665; Murphy v. Waterfront Commission, 378 U.S. 52, 79 n.84, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964). The government maintains, however, that it has met this considerable burden, and points out that the retrial itself provides a unique opportunity to demonstrate compliance with the mandate of Kastigar.

■ We agree that the prosecution in the present case has met the high proof burden commanded by Kastigar. It is undisputed that "[o]ne ... need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." Kastigar, 406 U.S. at 461–62, 92 S.Ct. at 1665. But this burden was not intended to be an insurmountable barrier, as Pantone contends. Such a construction would effectively transform the use and derivative use immunity statute in question, which Kastigar found to be constitutionally sufficient, into a transactional immunity statute of the sort 18 U.S.C. §§ 6002 and 6003 were intended to supersede, at least with respect to any giv-

---

**1.** *Ullmann v. United States*, 350 U.S. 422, 438, 76 S.Ct. 497, 506, 100 L.Ed. 511 (1956). Federal immunity statutes have existed since 1857; colonial Pennsylvania and New York enacted immunity legislation in the 18th century. *Kastigar v. United States*, 406 U.S. at 446, 92 S.Ct. at 1656.

**2.** In the Judiciary Act of 1789 the first Congress, recognizing the government's power and need to compel residents to testify in court, provided for compulsory attendance of witnesses in federal courts. 1 Stat. 73, 88–89.

**3.** *Kastigar v. United States*, 406 U.S. 441, 447, 92 S.Ct. 1653, 1657, 32 L.Ed.2d 212 (1972); *Brown v. Walker*, 161 U.S. 591, 610, 16 S.Ct. 644, 651, 40 L.Ed. 819 (1896).

en prosecutor.[4] We do not believe that mere access to immunized grand jury testimony prevents the government from carrying its burden under *Kastigar. In the Matter of the Grand Jury*, 524 F.2d 209, 219 (10th Cir. 1975), *cert. denied*, 425 U.S. 927, 96 S.Ct. 1526, 48 L.Ed.2d 170 (1976). The *Kastigar* rule prohibits the misuse of information gained under a grant of immunity; it does not require the government to disregard or discard information not obtained in this fashion. See *United States v. Catalano*, 491 F.2d 268, 272 (2d Cir.), *cert. denied*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974). The underlying objective of the Court in *Kastigar* was to achieve a reconciliation between a defendant's Fifth Amendment rights and the prosecutor's ability to proceed with untainted evidence. *Kastigar* avoided the absolute grant of amnesty from prosecution which transactional immunity would have necessitated. In the present instance, the spirit of *Kastigar* counsels against an absolute ban against participation by a prosecutor at the trial stage whenever there has been participation by such prosecutor at the grand jury stage.

Pantone relies primarily on *United States v. McDaniel*, 482 F.2d 305 (8th Cir. 1973), to support his theory that once a prosecutor has access to compelled testimony, the indirect use of such testimony in the government's case is unavoidable. In *McDaniel*, three volumes of transcript that recorded McDaniel's confession of his misdeeds were read in their entirety by the United States Attorney before the two federal indictments were handed down. The immunized state grand jury testimony concerned the same transactions upon which the two federal indictments were predicated. Furthermore, at the time the United States Attorney read the incriminating transcripts he was unaware that the testimony which was produced came pursuant to a grant of immunity; accordingly he could have perceived no reason to segregate McDaniel's immunized testimony from the government's other sources of information.[5] Moreover, the question of possible indirect use of McDaniel's testimony was not addressed until after trial.[6] These circumstances render it highly likely that access to the immunized testimony in *McDaniel* had a considerable subjective effect on the prosecutor. The court could reasonably conclude that the government, confronted with such a situation, could not possibly satisfy the *Kastigar* burden.[7] But the court limited this "virtually undischargeable" burden of proof to the unusual factors present in *McDaniel*. The controversy at hand is entirely distinguishable.

■ We note first that Pantone's grand jury testimony about his relationship with Landau, of the Cigarette & Beverage Tax Bureau, concerned matters different from Pantone's relationship with Levitt, the arrangement on which the trial here focused. In *McDaniel*, the federal prosecutor read 472 pages of self-incriminating grand jury testimony regarding bank practices which formed the very basis of the federal prosecution. The argument by Pantone seems to proceed as follows: because a similar type of fee-splitting arrangement was involved in Pantone's grand jury testimony and in

---

**4.** The principal issue in *Kastigar* was whether the use and derivative use provided by the 1970 immunity statute, 18 U.S.C. §§ 6002–6003, while admittedly not conferring the broad protection of previously enacted transactional immunity statutes, was nevertheless coextensive with the Fifth Amendment privilege. *Kastigar* held that this use and derivative use immunity was constitutionally adequate.

**5.** *United States v. McDaniel*, 482 F.2d at 311.

**6.** Although the United States Attorney tendered voluminous F.B.I. reports, received prior to the commencement of the state grand jury proceedings, as proof of an independent source

of the evidence adduced at trial, the court found that "such reports nevertheless fail to satisfy the government's burden of proving that the United States Attorney, who admittedly read McDaniel's grand jury testimony prior to the indictments, did not use it in some significant way short of introducing tainted evidence." *McDaniel*, 482 F.2d at 311. In the present case, the United States Attorney was exposed to the immunized testimony not only after the indictments, but after the entire first trial.

**7.** *United States v. McDaniel*, 482 F.2d at 312.

the crime for which he was convicted, the immunized testimony may be regarded as relating to the later prosecution. Careful scrutiny of the record here reveals that Pantone's claim of a relationship between his immunized testimony and retrial is tenuous at best. Concededly, the existence of a relationship between the compelled testimony and a later prosecution is a relevant, but not a controlling, issue, for such relationship might well magnify the prosecutor's difficulty of establishing the existence of independent evidentiary sources. But while a lack of relationship between compelled testimony and a later prosecution may aid in proving the absence of indirect use, the possible existence of a relationship between the compelled grand jury testimony and the conviction in this case is not conclusive in proving a violation of *Kastigar.* Unlike the dispositive question of relatedness posed by earlier transactional immunity statutes, the crucial inquiry for safeguarding derivative use immunity is, by definition, whether the testimony was *used,* not whether it is *related.*[8]

■ *Kastigar* underscored the principle that the presumption of use must be more than negated; the government has the duty to prove affirmatively that its evidence is derived from an independent source.[9] Existing case law appears to offer no sure guidance to the trial courts when they are considering the question of use or derivative use of immunized testimony at the retrial stage. However, even under the expansive definition of use developed in *McDaniel*—use which could include "assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea bargain, interpreting evidence, planning cross—examination, and otherwise generally planning trial strategy," 482 F.2d at 311—the government has successfully established that the immunized testimony was not used here. The earlier trial, and its trial transcript, constitute the wholly independent source for any evidence adduced at the retrial that *Kastigar* demands.[10] Indeed, a primary concern of *Kastigar* and the Department of Justice Guidelines,[11] that mere access to immunized information may catalyze chains of investigation or subliminally affect decisions to prosecute, is not even in issue here. The completion of the first trial before the testimony in question was compelled necessarily precludes any possibility that the original investigation was focused, prosecution initiated, or plea bargaining prior to the initial trial foregone on account of knowledge of the later immunized testimony. Nor is there evidence of any plea bargain offers after the prosecutor's expo-

---

**8.** As Justice Marshall's dissent in *Kastigar* makes clear, the full immunity from prosecution for the offense to which the compelled testimony relates accorded by transactional immunity was abrogated by the *Kastigar* decision. "Today the court holds that the United States may compel a witness to give incriminating testimony and subsequently prosecute him for crimes to which that testimony relates." 406 U.S. at 467, 92 S.Ct. at 1668.

**9.** "This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States,* 406 U.S. at 460, 92 S.Ct. at 1664.

**10.** *See* Note, *Standards for Exclusion in Immunity Cases,* 82 Yale L.J. 171, 182 (1972), which sets forth several objective standards that the government must meet to insure that the evidence it produces at trial is not derived from immunized testimony. The suggested procedure, which would require a prosecutor to file and to obtain court certification of all evidence intended for later trial use before making any grants of immunity, is fulfilled in this case by the existence of the trial transcript. The segregation and certification of evidence achieved in both instances tends to guarantee that subsequent exposure to immunized testimony did not taint the final trial.

**11.** In the wake of the *Kastigar* decision, the Department of Justice promulgated Sec. 1–11.-400 of the United States Attorney's Manual which sets forth criteria an attorney must meet should he seek to initiate prosecution of an offense first disclosed in or closely related to a witness's compelled testimony. Although Pantone relies on these guidelines, App.Br. 14–15, they appear to be inapplicable inasmuch as Pantone's offense relating to the Levitt Agency was neither "first disclosed in" nor "closely related to" his compelled testimony.

sure to the immunized information. Knowledge of compelled testimony could taint the retrial only insofar as it entered into cross–examination calculations, evidentiary offers or strategy decisions. However, unlike *McDaniel*, where the prosecutor attempted to explain away *after* the trial the possibility of subjective effect, the district court in the present case conducted a full *Kastigar* hearing *before* the retrial. At the hearing the United States Attorney specifically promised that the government's presentation on retrial would be identical to that in the original case. (App. 62a) It is possible here to compare trial strategy, cross–examination techniques and the introduction of evidence at the retrial with the original trial so as to assure absence of reliance by the prosecution on the immunized testimony.

■ It may be posited that mere access to the self–incriminating grand jury testimony could provide the United States Attorney a degree of psychological confidence he might otherwise lack, and therefore might imperceptibly affect the later trial. Yet, acknowledging *Kastigar's* total prohibition of the use of the immunized testimony as the only means of creating a comprehensive safeguard for the immunized witness, there is no indication that in the present situation such a potential motivational effect rises to the level of constitutional significance. The government had already obtained a jury conviction. The United States Attorney, moreover, undertook to provide Pantone's counsel with a copy of the grand jury testimony. Such a gesture tends to nullify any suggestion that the prosecutor sought to exploit his knowledge of the compelled information. Nor does the record indicate in any way that the United States Attorney learned anything new from the grand jury testimony–certainly nothing beneficial to the prosecution or inconsistent with its position at the original trial. It appears that the prosecutor was fully in control of his grand jury examination of Pantone: he proceeded by means of leading questions and elicited the information he both expected and wanted. (App. 10–24) *Cf. United States v. Catala-no*, 491 F.2d 268, 272 (2d Cir. 1974). The failure of the grand jury proceeding to uncover anything previously unknown simply buttresses the conclusion–which is apparent from a comparison of the transcripts in the first and second trials–that the government relied solely on independent sources of information in conducting the retrial.

■ Lastly, Pantone implies, without stating directly, that he did not take the stand at the second trial for fear that the government would employ the immunized testimony to impeach him. However, as we found in *United States v. Frumento*, 552 F.2d 534 (3d Cir. 1977), such an impeachment dilemma is illusory. In *Frumento* we affirmed the district court's entry of a contempt order against a defendant who refused to testify after a grant of immunity under 18 U.S.C. § 6002. We held that a defendant "is fully protected by § 6002 immunity from having any truthful testimony he may give–even though inculpatory–used against him." *Frumento*, 552 F.2d at 544. The Court there read *Kastigar* as preventing the government from using immunized testimony for the purpose of impeaching a defendant should he testify in his own defense at a subsequent trial on the ground that any other interpretation would afford the immunized witness something less than his Fifth Amendment protection. Thus, the defendant's only legitimate fear was that untruthful immunized statements could be used against him in a later perjury prosecution. Yet, as we concluded in *Frumento*, and as the Supreme Court has recently emphasized in *United States v. Apfelbaum*, 445 U.S. 115, 99 S.Ct. 1496, 63 L.Ed.2d 250 (1980), neither § 6002 nor the Fifth Amendment privilege against compulsory self–incrimination provide protection for the commission of perjury during the course of grand jury questioning.

Assuming that Pantone was not seeking to preserve an intention to commit perjury in filing his motion to dismiss the prosecutor, then the recent Supreme Court decision of *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), unequivo-

cally protects Pantone's Fifth Amendment privilege. *Portash* affirmed a New Jersey court ruling "that a person's testimony before a grand jury under a grant of immunity cannot constitutionally be used to impeach him when he is a defendant in a later criminal trial." 440 U.S. at 459–60, 99 S.Ct. at 1297. In *Portash*, the trial judge had ruled that if Portash took the stand and gave an answer on direct or cross–examination which was materially inconsistent with his grand jury testimony, the prosecutor could use that immunized testimony in his cross–examination of Portash. Portash then declined to testify because this erroneous ruling meant that the immunity granted by the New Jersey statute was not coextensive with the privilege afforded by the Fifth and Fourteenth Amendments.[12] In the present case, however, the prosecutor indicated at the *Kastigar* hearing that he did not believe it was legally permissible to use Pantone's testimony for impeachment purposes (App. 60), and the district court ruled at the close of the hearing that an attempt to use the grand jury testimony in any way would provide a clear basis for a mistrial. Also, as the defense was about to rest at the second trial, the prosecutor reiterated that he had no intention of using the immunized testimony on cross–examination. (App. 512) Although Pantone now suggests that the possible indirect use of his immunized testimony for impeachment purposes

affected his decision not to testify, this final aspect of his constitutional challenge is highly speculative.[13] There is no indication that Pantone intended to testify on his own behalf, and Pantone, unlike Portash, did not even receive an adverse evidentiary ruling from the trial court.[14] Admittedly, the question whether a nonevidentiary use of immunized testimony has occurred is sometimes one of metaphysical subtlety. In Pantone's case, though, it is largely hypothetical.[15]

The difficulties of discerning use, or as here indirect use, of immunized testimony make it critical that prosecutors be held to a high standard in proving that their actions are untainted by exposure to prior compelled testimony. Nevertheless, if a prosecutor is privy to immunized testimony after a full trial and conviction, it is possible to ensure, in compliance with *Kastigar*, that such testimony was not used at the retrial and did not lead to the conviction of the defendant.

### CONCLUSION

Inasmuch as we are unpersuaded by the arguments advanced by Kumer and Pantone on this appeal, we affirm the judgment of the district court.

---

**12.** The New Jersey statute provided for "use and derivative use" immunity, similar to 18 U.S.C. § 6002. A companion case to *Kastigar*, *Zicarelli v. New Jersey State Comm'n. of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972) considered an analogous situation arising under another New Jersey immunity statute, N.J.Rev.Stat. § 52:9M–17(a) (Supp. 1970). Although the holding and discussion in *Kastigar* applies directly to the federal government only, it applies by reference to the states through *Zicarelli*.

**13.** Pantone's counsel admitted that his file contained a copy of *Portash* and that he did not expect the Government to succeed if it attempted to make use of the compelled testimony for purposes of impeachment should Pantone testify. App.Br. 12.

**14.** The colloquy between Justice Stewart, the author of the opinion of the Court, Justice Powell, who wrote a concurrence and Justice Black-

mun who dissented in *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), suggests that, at least in the federal courts, absent an adverse ruling, the constitutional issue of a Fifth Amendment violation would not have been properly presented. There is an indication in *Portash* that the preferred method for raising claims such as Pantone's would be for the defendant to take the stand and appeal a subsequent conviction on the ground that the prosecutor had been allowed to use immunized testimony for impeachment over defendant's claim of immunity. 440 U.S. at 462, 99 S.Ct. at 1298 (Powell, J., concurring).

**15.** Pantone, when asked by the Court to identify specific misuses of compelled testimony, could identify none.