**UNITED STATES of America**

v.

**Lawrence A. SMITH.**

**Crim. No. 83-39.**

United States District Court,
D. New Jersey.

Feb. 27, 1984.

W. Hunt Dumont, U.S. Atty. by Cecilia L. Gardner, Sp. Atty., Dept. of Justice Organized Crime and Racketeering Section, Newark, N.J., for the U.S.

Raymond A. Brown, Henry F. Furst, Brown, Brown & Furst, P.A., Newark, N.J., for defendant.

## OPINION

BROTMAN, District Judge.

In this criminal prosecution the court has applied the principles enunciated in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), to determine whether the evidence intended to be used by the federal government at trial is impermissibly tainted by the defendant's prior immunized testimony before a state investigative commission. After conducting an extensive pretrial hearing to determine the nature and source of the government's evidence, the court concludes that the case to be presented by the government at trial is derived from sources totally independent of the defendant's immunized testimony. Accordingly, the court finds that the government's evidence is in no way tainted and will allow this prosecution to proceed.

## BACKGROUND

Defendant Lawrence A. Smith is charged in the present indictment with one count of conspiring in violation of 18 U.S.C. § 371, one count of mail fraud in violation of 18 U.S.C. § 1341, and five counts of soliciting

and accepting bribes in violation of 18 U.S.C. § 1954. The charges brought against the defendant allege his participation in a complicated scheme of solicitations, bribes and kickbacks beginning in late 1974 or early 1975 involving the defendant, two corporations in which he was the sole stockholder and chief operating officer, union officials, employee severance trust funds and an insurance company. More specifically, Smith is charged, *inter alia*, with providing kickbacks to union leaders for the right to administer their employee benefit plans, while simultaneously receiving kickbacks from the insurance company to whom he brought the unions' business. This indictment was returned by a federal grand jury in Camden, New Jersey on February 22, 1983.

It is undisputed that the defendant had been compelled to testify under a grant of statutory immunity[1] before the New Jersey State Commission of Investigation ("SCI") during 1980. He was immunized on June 5, 1980, and testified before the SCI a total of eight times between that date and December 11, 1980. His first six appearances before the SCI were in proceedings closed to the general public and his last two appearances were in open, public hearings. The SCI investigation focused on the adequacy of the laws of New Jersey regulating health care plans, whether those laws were being effectively enforced, and to what extent criminal elements had infiltrated the state's health care industry.

In its pretrial submissions, the government tacitly conceded that the scope of inquiry of the SCI investigation overlapped to some degree with the subject matter of the present indictment. This overlap in subject matter between the previous immunized testimony and the federal indictment triggered the rights outlined in the seminal case of *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), wherein the Court stated:

> Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecutions, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they have an independent source for the disputed evidence.

*Id.* at 79 n. 18, 84 S.Ct. at 1609 n. 18. Defendant Smith has made the initial demonstration required by *Murphy* and has therefore shifted to the government the burden of demonstrating that its evidence

---

[1] Smith was immunized pursuant to N.J.S.A. 52:9M–17, which provides for the conferral of immunity upon witnesses before the New Jersey State Commission of Investigation. That statute provides, in relevant part:

> a. If, in the course of any investigation or hearing conducted by the commission pursuant to this act, a person refuses to answer a question or question or produce evidence of any kind on the ground that he will be exposed to criminal prosecution or penalty or to a forfeiture of his estate thereby, the commission may order the person to answer the question or questions or produce the requested evidence and confer immunity as in this section provided. No order to answer with immunity shall be made except by majority vote and after the Attorney General and the appropriate county prosecutor shall have been given at least 7 days written notice of the commission's intention to issue such order and afforded an opportunity to be heard in respect to any objections they or either of them may have to the granting of immunity.

> b. If upon issuance of such an order, the person complies therewith, he shall be immune from having such responsive answer given by him or such responsive evidence produced by him, or evidence derived therefrom used to expose him to criminal prosecution or penalty or to a forfeiture of his estate, except that such person may nevertheless be prosecuted for any perjury committed in such answer or in producing such evidence, or be prosecuted for willful refusal to give an answer or produce evidence in accordance with an order of the commission pursuant to section 18, or held in contempt for failing to give an answer or produce evidence in accordance with the order of the commission pursuant to section 11; and any such answer given or evidence produced shall be admissible against him upon any criminal investigation, proceeding or trial against him for such perjury, or upon any investigation, proceeding or trial against him for such contempt or willful refusal to give an answer or produce evidence in accordance with an order of the commission.

against him was derived independently of the state immunity grant.

The extent of the government's burden was outlined in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), where the Court held:

> The burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

*Id.* at 460, 92 S.Ct. at 1664. The *Kastigar* Court went on to indicate how light the defendant's initial burden is to trigger a hearing on taint (now commonly known as a *"Kastigar"* hearing) and reemphasized the scope of the government's burden once such a hearing becomes necessary:

> One raising a claim ... need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.

*Id.* at 461–62, 92 S.Ct. at 1665–66.

Regrettably, while outlining the nature of the government's burden in *Kastigar*, Justice Powell neglected to precisely outline the appropriate procedures to be used in the district courts in conducting taint hearings. *See United States v. Pantone*, 634 F.2d 716, 719 (3rd Cir.1980) ("It has been left to the lower courts to define the exact contours of the standards that the government must meet in varying contexts before evidence will be deemed untainted by association with compelled testimony") In the decade following *Kastigar*, the lower courts have grappled with this issue with mixed success. As the Third Circuit has observed: "Existing case law appears to offer no sure guidance to the trial courts when they are considering the question of use or derivative use of immunized testimony." *United States v. Pantone, supra*, 634 F.2d at 721.

Accordingly, in designing this *Kastigar* hearing, this court found itself faced with three issues. First, how can the government meet its "heavy burden," 406 U.S. at 461, 92 S.Ct. at 1665, of showing that the defendant's immunized testimony has not been directly or indirectly used in this prosecution? Second, what format should the hearing take? Third, when should the hearing be held?

## THE GOVERNMENT'S BURDEN OF PROOF

As to the first question, it is clear that the government must show that it has not and will not use the compelled testimony or its fruits against the defendant *in any manner* in connection with the federal prosecution. *Murphy v. Waterfront Commission, supra*, 378 U.S. at 79, 84 S.Ct. at 1609. The Supreme Court has recently emphasized that the testimony compelled from a witness under immunity must leave him and the government "in substantially the same position as if the witness had claimed his privilege [to remain silent] in the absence of a state grant of immunity." *Pillsbury Co. v. Conboy*, —— U.S. ——, 103 S.Ct. 608, 613, 74 L.Ed.2d 430 (1983); *see also United States v. Semkiw*, 712 F.2d 891, 895 (3rd Cir.1983); *United States v. Gerace*, 576 F.Supp. 1185 (D.N.J.1983).

The government's burden is not limited to a showing that it will not use the testimony directly (for example, introducing it into evidence) or indirectly (for example, as a means to other evidence). It also has the "affirmative duty" of showing that it did not and will not exploit the immunized testimony in more subtle, elusive ways. *United States v. Semkiw, supra*, 712 F.2d at 895. In *Semkiw*, the Third Circuit warned that "[s]uch use could conceivably include ... refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise planning trial strategy." *Id., quoting United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir.1973). The court has even suggested that the use of immunized testimony as a morale booster or to provide additional confidence to federal prosecutors in preparing for trial may be an impermissible use of immunized testimony. *United States v. Pantone*, 634 F.2d 716, 722 (3rd

Cir.1980). *Cf.* Note, Standards for Exclusion in Immunity Cases, 82 Yale L.J. 171, 181 (1972) ("No one ... can accurately estimate the subjective effect of knowledge of the witness's guilt on the investigator's zeal in pursuing new evidence").

■ While the government's burden of proof is thus undeniably high, the protection mandated by *Kastigar* "was not intended to be an insurmountable barrier." *Pantone, supra,* 634 F.2d at 719. If it were, it "would effectively transform the use and derivative use statute in question, which *Kastigar* found to be constitutionally sufficient, into a transactional immunity statute ... at least with regard to any given prosecutor." *Id.*[2] It is thus indisputable that Smith can be prosecuted and convicted for his allegedly illegal conduct, even if that conduct was the subject of his SCI testimony, so long as the federal prosecutors made no direct or derivative use of his testimony before the SCI.[3]

■ The case law provides little guidance as to the specific standard of proof to be imposed on the government in a *Kastigar* hearing. As noted above, *Kastigar* repeatedly holds that the government has a "heavy burden" in showing that its evidence derives from legitimate sources independent of the immunized testimony. 406 U.S. at 461, 92 S.Ct. at 1665. The court is persuaded by Judge VanArtsdalen's con-

clusion in *United States v. Hossbach,* 518 F.Supp. 759 (E.D.Pa.1980), that requiring the government to come forward with "clear and convincing evidence," as opposed to merely a preponderance of the evidence, is the most logical standard for this type of hearing. 518 F.Supp. at 772. Accordingly, it is by this higher standard that this court has analyzed the evidence before it.

## THE FORMAT OF THE HEARING

Having thus determined the nature of the government's burden of proof, the court turns to the question of the proper format for a *Kastigar* hearing. Four formats for the presentation of the government's case were considered by the court.[4]

1. First there was the possibility of government prosecutors demonstrating at a hearing that a "Chinese Wall" existed between the SCI investigation and the federal investigation, *i.e.,* that the two investigations coexisted with no information passing from state sources to federal investigators.

■ This suggestion was forcefully rejected in *United States v. Nemes,* 555 F.2d 51, 55 (2nd Cir.1977), cited approvingly in *United States v. Semkiw, supra,* 712 F.2d at 895. The court in *Nemes* reasoned that:

---

2. The statute pursuant to which Smith was immunized, like that discussed in *Pantone,* guaranteed him immunity only from the use and derivative use of his testimony before the SCI. *See* N.J.S.A. 52:9M–17(b), quoted *supra* note 1. By contrast a grant of transactional immunity would have accorded Smith protection from prosecution on any offense related to the testimony. *Compare* 18 U.S.C. §§ 6002 and 6003 (use immunity) *with* 18 U.S.C. § 2514 (repealed 1970) (transactional immunity). As explained in *Pantone:*

 The principal issue in *Kastigar* was whether the use and derivative use provided by the 1970 immunity statute, 18 U.S.C. §§ 6002–6003, while admittedly not conferring the broad protection of previously enacted transactional immunity statutes, was nevertheless coextensive with the Fifth Amendment privilege. *Kastigar* held that this use and derivative use immunity was constitutionally adequate.

*United States v. Pantone, supra,* 634 F.2d at 720 n. 4.

3. The task of the court in this *Kastigar* hearing is thus to accommodate the competing interests of a defendant who has provided immunized testimony and of governmental authorities who are attempting to vindicate the law:

 The underlying objective of the Court in *Kastigar* was to achieve a reconciliation between a defendant's Fifth Amendment rights and the prosecutor's ability to proceed with untainted evidence. *Kastigar* avoided the absolute grant of amnesty from prosecution which transactional immunity would have necessitated.

*Pantone, supra,* 634 F.2d at 720.

4. The court freely admits that the alternatives for a *Kastigar* hearing presented in this opinion do not exhaust the universe of potential formats.

The inference that the prosecutor's lack of access to compelled testimony assures the existence of independent sources cannot be relied upon to afford the witness the full protection the Constitution guarantees. The prosecutor may have never seen the witness's testimony and may believe in good faith that no one associated with the federal prosecution has seen it, but such a disclaimer does not preclude the possibility that someone who has seen the compelled testimony was thereby led to evidence that was furnished to federal investigators. Only by affirmatively proving that his evidence comes from sources independent of the immunized testimony can the prosecutor assure that the witness is in the same position he would have enjoyed had his self-incrimination privilege not been displaced by use immunity.

*See also Kastigar, supra,* 406 U.S. at 469, 92 S.Ct. at 1669 (Marshall, J., Dissenting) ("... the paths of information through the investigative bureaucracy may well be long and winding, and even a prosecutor acting in the best of faith cannot be certain that somewhere in the depths of this investigative apparatus, often including hundreds of employees, there was not some prohibited use of the compelled testimony.") The court shares these concerns, and finds that a Chinese-Wall format, standing alone,[5] is insufficient to guarantee the absence of taint.

2. Second, there was the possibility of the federal investigators and prosecutors stipulating that they conducted their investigation independently of the SCI probe, made no use of the immunized testimony in pretrial preparations, and will not use the testimony in any way at trial.

■ The court rejects the notion that any such stipulation and denial of use by federal prosecutors, standing alone, is sufficient to negate the possibility of taint. Such a stipulation was considered and rejected in *United States v. Nemes, supra,*

555 F.2d at 54–55, as inconsistent with the government's heavy burden of proof. *See also United States v. Semkiw, supra,* 712 F.2d at 895. Such an approach would also flaunt the Supreme Court's warning in *Kastigar* that a witness should "not [be] dependent for the preservation of his rights on the integrity and good faith of the prosecuting attorneys." *Kastigar, supra,* 406 U.S. at 460, 92 S.Ct. at 1664, *quoted in Semkiw, supra,* 712 F.2d at 894. Moreover, the problems inherent in a "Chinese Wall" approach discussed above apply equally to a "stipulation" approach.

■ 3. A third possible procedure would be for the government to demonstrate conclusively at the *Kastigar* hearing that it had prior knowledge of the information contained in Smith's immunized testimony.

This procedure would similarly be inadequate. In *Semkiw* "[o]ne of the undisputed facts was that the prosecution already possessed all of its evidence against the defendant even before it compelled him to testify." 712 F.2d at 895. Nonetheless the court ruled that the record in that case "[did] not show that defendant and the prosecution remained in substantially the same position as if defendant had not testified." *Id.* The court reasoned that prior knowledge by federal prosecutors of the case against the defendant would not preclude the government's use of defendant's subsequent, immunized testimony in other, more subtle ways, such as for interpreting evidence or planning cross-examination. Accordingly, the court remanded the case to the district court for findings as to the issue of the use or derivative use of the immunized testimony. *Id.* In the instant case, this court must therefore conclude that a demonstration of prior knowledge of the case against Smith would not constitute a sufficient negation of the possibility of taint and would not prove that the case against the defendant was derived from

**5.** Proof that the two investigations were insulated from one another from the moment Smith was immunized before the SCI is merely one

element of the government's burden of proof in this case. *See* discussion *infra* page 1424.

sources wholly independent of the immunized testimony.[6]

 4. The fourth possibility, ultimately chosen by the court, was for a full evidentiary hearing at which the government would be required to demonstrate conclusively (1) that the evidence to be presented at trial was derived from sources totally independent of the defendant's immunized testimony; and (2) that the government did not use the immunized testimony *in any respect.* This format strikes the court as the only means whereby the government can satisfy the heavy burden imposed on it by *Kastigar* and its progeny.

The procedure of a full evidentiary hearing before a trial judge was recommended in *United States v. Hossbach,* 518 F.Supp. 759 (E.D.Pa.1980):

> Probably the only way the government could ever meet its "heavy burden" ... would be to present at a pretrial hearing all of the testimony and evidence it proposes to present at trial. The trial judge would then be required to make specific findings of fact and conclusions of law as to taint and, in effect, by a full nonjury "pretrial trial" purge the record to be developed at trial.

*Id.* at 771–72. Similarly the Third Circuit in *Semkiw* followed the Second Circuit's *Nemes* opinion by remanding the proceeding to the district court "so that it may conduct an evidentiary hearing and make findings of fact and conclusions of law." 712 F.2d at 895.

This court is in accord with the procedures supported in *Hossbach* and *Nemes,* and would add the following qualification.

Demonstrating that the evidence to be used at trial was "untainted" would not alone necessarily establish that the government did not use the immunized testimony in some of the more subtle and remote ways discussed above. For instance, it would not indicate whether the government used the evidence in its approach to plea-bargaining, in interpreting evidence or in planning cross-examination for trial. *Semkiw* requires that the record of a *Kastigar* hearing demonstrate what use the prosecution may have made of immunized testimony "in the *preparation* and conduct of trial." 712 F.2d at 895 (emphasis supplied). Accordingly, in addition to showing that the federal government's evidence is derived from sources totally independent of the defendant's immunized testimony, the government must demonstrate the steps it took to establish a "Chinese Wall" between its investigation and that of the SCI as of the date Smith was granted statutory immunity.

## THE TIMING OF THE HEARING

The government argued that if a *Kastigar* hearing was necessary, it should be held post-trial rather than pre-trial. In support of this argument, the government made the following points: (1) its case had not yet solidified into a form conducive to a pre-trial preview; (2) a pre-trial hearing would unduly fix the government's trial strategy and give the defendant an unwarranted peek at the government's case; (3) if the government deviates from its mini-trial evidence and presents testimony not yet approved as untainted by the court, defendant will call for a hearing and thereby disrupt the trial; and (4) if a pre-trial

**6.** The court acknowledges that in *United States v. Provenzano,* 620 F.2d 985 (3rd Cir.1980), *cert. denied,* 449 U.S. 899 (1980), the Third Circuit made the qualified remark that "[i]f the Government's documents conclusively demonstrate prior knowledge, *we know of no reason why a hearing must be held.*" 620 F.2d at 1006 (emphasis supplied) (footnote omitted). The court believes that this statement, made in the court's brief discourse on the topic of immunity at the end of a long discussion of other questions, is no longer viable in light of the stringent requirements set forth in *Semkiw.* The approach in

*Provenzano* is implicitly overruled by *Semkiw's* admonishment that the prosecution may not use immunized testimony "in any respect," including preparation for trial. 712 F.2d at 895. Thus under *Semkiw,* even if the prosecutors in this case could show that their *evidence* against Smith derived from their investigation prior to June 5, 1980 (the date of Smith's grant of immunity by the SCI), there would be no guarantee that Smith's immunized testimony was not used in some other more subtle way in preparation for this prosecution.

hearing is not held and defendant is acquitted, the need for a mini-trial will be eliminated.

Ranged against these considerations were the following points: (1) the government's reluctance to expose its case pre-trial has no bearing on the proper method necessary to safeguard defendant's Fifth Amendment rights; (2) the court expects the government to have the bulk of its trial evidence ready immediately, for a pre-trial airing; (3) in the court's view, evidence not subjected to pre-trial review, may upon motion of counsel, be scrutinized out of the jury's hearing without unduly delaying the trial; (4) if the court finds at a pre-trial hearing that the prosecution unduly exploited defendant's immunized testimony, the indictment may be dismissed and the possibility of trial ended; and (5) if a post-trial hearing should find extensive improper use of tainted evidence, the court may be forced to declare the proceedings a mistrial and hold a second, lengthy trial.

█ Precedent indicates that in almost every instance involving a *Kastigar* issue, a pre-trial hearing was held. The court notes that in *Semkiw* the Third Circuit ordered a post-trial hearing, but the court does not find this order discordant with the idea that a pre-trial hearing is the proper arrangement. The court reads *Semkiw* to say that the proper response to a motion for a pre-trial *Kastigar* hearing is to hold that hearing before trial; post-trial *Kastigar* hearings are appropriate only when the court has either not been faced with a motion for a *Kastigar* hearing pre-trial or when the court has erred in its discretionary determination of whether to hold a *Kastigar* hearing at all. Certainly, nothing in *Semkiw* provides authority for a court faced with the situation now at hand—a clearcut choice between a pre-trial and a post-trial hearing—to hold that a post-trial hearing is superior.

When these considerations were weighed in conjunction with the language of *Kastigar* itself, which twice refers to the need for the government to purge of taint "the evidence it *proposes* to use," 406 U.S. at 460, 461, 92 S.Ct. at 1664, 1665 (emphasis added), the court found that a *pre*-trial hearing is the recommended course.

The court recognized that such a hearing would prove onerous and time-consuming. Nonetheless, a hearing on this scale is in the government's interest as well as defendant's and is the only means by which the court can satisfy the requirements of *Kastigar* and *Murphy*.

**THE HEARING IN THIS CASE**

Following the procedure discussed above, this court conducted a twenty-six day evidentiary hearing that produced over 3,500 pages of transcript testimony. As noted above, the court imposed two burdens on the government. First it was required to present testimony that showed that the evidence presented at trial was derived from sources totally independent of the defendant's immunized testimony. Second, in compliance with the strict standards set forth in *Semkiw*, it was required to show that the government's investigation was insulated from the SCI investigation from the moment that Smith was granted statutory immunity to the present time. Only through this dual showing could the government meet its burden of showing that it has in no way benefitted from Smith's immunized testimony.

At the hearing, federal officials from all phases of the government's investigation of the defendant testified and were fully cross-examined by defendant's counsel. Among these witnesses was the prospective trial attorney for the government,[7] whose testimony detailed, among other things:

1. The evidence that would be introduced by the government at trial;

2. The sources of that evidence;

---

7. To ensure that the prospective trial attorney would not be tainted by access to the defendant's immunized testimony, the government assigned Cecilia L. Gardner, a Special Attorney

with the Department of Justice Organized Crime and Racketeering Section, Newark Field Office, to represent the United States at the *Kastigar* hearing. *See Semkiw, supra,* 712 F.2d at 895.

3. The witness who would be identifying and explaining the evidence at trial;

4. The time at which he came to the determination that the evidence he planned to introduce would be useful at trial; and

5. The basis of his decision that certain evidence would be useful at trial.

(Tr. 8/31/83, p. 121—9/1/83, p. 18)

In addition to outlining this information as to the evidence to be introduced at trial, the trial attorney

1. Named and identified each witness that he planned to call at trial;

2. Explained the substance of their testimony;

3. Named the exhibits that the witnesses would identify and on which their testimony would be based;

4. Explained the point at which he determined that their testimony would be useful;

5. Explained how he came to the decision that their testimony would be useful; and

6. Described what contact (if any) the witnesses had with Smith's SCI testimony.

(Tr. 9/1, p. 29—9/2, p. 74)

After the government presented its case, the defendant produced several witnesses; the government concluded the hearing with one additional witness. Exhibits were introduced into evidence by both sides.

At the end of the hearing, the parties were ordered to submit proposed findings of fact and conclusions of law, keyed to the hearing transcript. By subsequent order, a sequence of submissions was determined, whereby the government initially submitted proposed findings of fact and conclusions of law. Within 45 days after the government's submission was received, the defendant submitted its proposed findings and conclusions; and within 21 days after the defendant's submission was received the government submitted a reply brief. These long periods of time between submis-

sions were required because of the volume of the record in this case.

The court has fully considered the testimony of the witnesses, the evidence presented at the hearing by both the government and the defendant, and the post-hearing submissions of both parties. As in any nonjury evidentiary hearing, the court has made decisions as to the credibility of the witnesses before it, and those decisions are necessarily reflected in the court's ultimate findings in this case.

The court must emphasize that the findings and conclusions below are very specifically directed toward the only issue in this hearing, *i.e.*, whether the federal government has benefitted in any respect from the defendant's immunized testimony. The court has deliberately *not* attempted to restate all of the evidence presented at the hearing, but has instead focused on the *Kastigar* framework discussed above to reach a reasoned conclusion as to whether Smith's immunized testimony has been exploited. In reaching its ultimate conclusion that the government's case is free of taint, the court expresses no opinion as to the guilt or innocence of the defendant.

The following represents the court's Findings of Fact and Conclusions of Law in this matter.

**FINDINGS OF FACT**

1. Joel Friedman, Esquire ("Friedman") is an attorney in charge of the Philadelphia Strike Force, Organized Crime and Racketeering Section of the United States Department of Justice. (Hearing Transcript 8/9, p. 51).

2. In February 1978 Friedman assigned two staff attorneys, Robert Courtney, Esquire ("Courtney") and Ron Cole, Esquire ("Cole") to investigate the activities of defendant Lawrence A. Smith. (8/9, p. 52). Other individuals involved in the Philadelphia-based investigation of the defendant included Chris Kelly ("Kelly"), a special agent of the United States Department of Labor (8/16, p. 105);[8] Creed Black, Es-

---

8. Each of these investigators testified and were cross-examined about their activities in connection with the investigation of the defendant.

Their testimony begins on the indicated date and page of the hearing transcript. Cole's testi-

quire ("Black"), an attorney with the Philadelphia Strike Force (8/18, p. 117); Frank McLaughlin ("McLaughlin"), a special agent of the Internal Revenue Service (8/18, p. 198); Edward J. Kain ("Kain"), then a special agent of the Internal Revenue Service (8/19, p. 99); Ricardo Zayas ("Zayas"), an agent of the United States Department of Labor (8/19, p. 142); and Melvin Gudknecht ("Gudknecht"), a special agent of the United States Department of Labor (8/22, p. 57). All of the individuals named above will be collectively referred to in this opinion as the "Philadelphia investigators."

3. The Philadelphia investigators were primarily probing Smith's connections with organized crime and his possible participation in a complex scheme of bribes and kickbacks. Among other things, Smith was suspected of (1) siphoning funds from his closely held corporations and not reporting these funds for tax purposes (8/18, pp. 198–99); (2) giving kickbacks to labor union officials in return for the right to provide administrative services to their employee severance plans (8/10, p. 79); and (3) accepting kickbacks from the Capital Life Insurance Company, the company providing insurance to the labor unions who were Smith's clients (8/10, p. 80). The investigation of Smith also included an investigation of three of his closely held corporations, Rittenhouse Consulting Services and Severance Administrators, Inc. (8/9, p. 51) and T.R.P. Incorporated (8/15, p. 5).

4. In early 1978, the Philadelphia Strike Force opened a grand jury investigation of Smith under Cole's supervision, and began issuing subpoenas (8/10, p. 81). Subpoenas were issued for over two years, ending in mid-1980; Cole estimates that over 100 subpoenas were issued in that time (*Id.*).

5. While Cole, Kelly and the other Philadelphia investigators were probing Smith's activities with labor unions, organized crime and kickbacks, Courtney conducted an investigation of T.R.P. Incorporated, a trucking company owned by Smith (8/15, p. 5). Courtney's investigation dealt

mony begins at 8/10, p. 78. Courtney's testimo-

with possible violations by Smith of the Taft-Hartley Act and federal extortion statutes (8/15, p. 6).

6. In 1979, the New Jersey State Commission of Investigation ("SCI") began a probe of the influence of organized crime on employee health plans and labor unions in New Jersey. It became interested in obtaining information about Smith and his connection with organized crime figures (8/16, p. 109).

7. SCI officials contacted the Philadelphia investigators in the Fall of 1979 and attempted to acquire information about Smith (8/16, p. 108).

8. The Philadelphia investigators informed the SCI that information about Smith that was gathered through the Philadelphia grand jury investigation could only be obtained through an application to the United States District Court (8/10, p. 88). The individual Philadelphia investigators were informed by their superiors not to divulge any grand jury information to the SCI (8/16, p. 111).

9. The Philadelphia investigators were notified in the Spring of 1980 that the SCI intended to immunize Smith as part of their investigation of corruption in the health care industry in New Jersey (8/16, pp. 113–15; 8/9, p. 55).

10. Michael Siavage ("Siavage"), an SCI official, met with Friedman, Cole and Kelly in Philadelphia on May 30, 1980, to discuss the immunization of Smith (8/9, p. 56; 8/16, p. 115). Friedman told Siavage that he (Friedman) would send Philadelphia investigators to SCI headquarters to obtain whatever information the SCI had gathered about Smith before the grant of immunity (8/9, p. 57). After the meeting with Siavage, Friedman instructed Kelly and another agent to go to the SCI before Smith was immunized to acquire the information that the SCI had gathered (8/9, pp. 57–58).

11. Kelly and three other Philadelphia investigators visited the offices of the SCI on June 2 and 3, 1980, to review the infor-

ny begins at 8/15, p. 3.

mation which had been gathered by SCI investigators (8/16, p. 117; 8/18, p. 202; 8/19, p. 102; 8/22, p. 59). Among the materials viewed by Kelly were the ledgers and journals of Smith's corporations (8/16, p. 117). Kelly and the other Philadelphia investigators did not return to the SCI after their visits on June 2 and 3, 1980 (8/16, p. 118; 8/18, p. 202; 8/19, p. 202; 8/22, pp. 62–63).

12. Kelly and Zayas had contact with SCI officials after June 3, 1980, but did not speak to anyone at the SCI about Smith after that date (8/16, pp. 118–20; 8/19, p. 146).

13. After Friedman and Cole learned at the meeting in Philadelphia with Siavage (8/16, p. 115) that Smith was going to be immunized by the SCI, they instructed all of the Philadelphia investigators not to have any further contact with the SCI's investigation of Smith (8/12, p. 74; 8/16, pp. 115–16; 8/17, p. 104; 8/18, p. 201; 8/19, pp. 102, 144; 8/22, p. 59). Similarly, the Executive Director of the SCI instructed SCI investigators that no contact regarding the Smith investigation could be made between the SCI and the federal investigators after Smith was granted immunity by the SCI (9/20, pp. 16–17). In accordance with these directives, no further discussions about Smith took place between the federal and SCI investigators (9/20, p. 17; 8/10, p. 89; 8/16, pp. 119–20; 8/17, pp. 215–16; 8/18, p. 201; 8/19, p. 146; 8/22, p. 63).

14. Cole supervised the issuance of subpoenas in connection with the Philadelphia federal grand jury investigation of Smith (8/10, p. 81). Courtney issued a large number of subpoenas in connection with his investigation of T.R.P. (8/15, pp. 10–154) and issued two subpoenas in connection with the investigation of kickbacks and employee severance plans (8/16, p. 136). Black issued at least two subpoenas in connection with the kickback investigation (8/18, p. 137).

15. The decisions by these and other Philadelphia investigators to issue subpoenas on behalf of the Philadelphia grand jury derived from information obtained prior to June 5, 1980 (the date that Smith was immunized) and/or from information totally independent of Smith's immunized testimony (8/10, pp. 81–200; 8/11, pp. 1–45; 8/15, pp. 10–154; 8/16, pp. 136–37; 8/18, pp. 210, 214–15).

## THE SCI INVESTIGATION

16. Smith first appeared before the SCI on June 5, 1980. When he asserted the Fifth Amendment privilege in response to all questions asked, the Commission granted him use immunity pursuant to N.J.S.A. 52-9M-17 (SCI Executive Session Transcript, 6/5/80, pp. 7–9).[9]

17. The focus of the SCI investigation was "whether the laws of the State of New Jersey regulating health-care plans are being effectively implemented and enforced, whether the laws and regulation pertaining to health-care plans are adequate, and whether and to what extent criminal elements have infiltrated the health-care-plan industry" (*Id.* at 2–3).

18. The subsequent questioning of Smith by SCI officials focused, *inter alia*, on his role as an administrator of dental plans for labor unions, and his association with purported organized crime figures including Angelo Bruno and Ralph Natale (SCI Executive Session Transcript 6/19/80; 7/2/80; 9/20/80; 11/10/80; Public Hearing Transcript 12/9–12/10/80; 12/11/80). Smith repeatedly denied participating in or knowing about illegalities in the New Jersey health care industry (Public Hearing Transcript 12/9–12/10/80, pp. 23–32; 12/11/80, pp. 334–35).

19. Smith's public appearances before the SCI were reported in the media (*Kastigar* hearing 9/13, pp. 24–25).

20. Newspaper clippings which mentioned Smith's SCI appearance were introduced into evidence at the hearing (9/13, p.

---

**9.** Filed with the court are the transcripts of Smith's appearances before the SCI, both in executive session and in public appearances.

Where SCI transcript references are not specifically noted, the citations in the text are to the *Kastigar* hearing.

137). The court has carefully reviewed all of these clippings and finds that those few that mention the substance of Smith's testimony refer only to his repeated denials of knowledge or participation in illegal activities. For example, Defense Exhibit 24, an article from the *Burlington County (N.J.) Times*, December 11, 1980, reports "Smith denied [that Ralph] Natale made any threat [to union officials]." Similarly, Defense Exhibit 15, an article from the *New York Times*, December 12, 1980, reported "[Smith] answered 'absolutely not,' when he was asked if he ever gave money to Mr. Natale or Mr. Bruno."

21. Libby Kolman ("Kolman"), Smith's former secretary, was called by the defendant to introduce the newspaper clippings into evidence (9/13, pp. 35–46). On cross-examination by the government, she confirmed that the newspaper articles, television and radio reports that mentioned Smith's appearance before the SCI only stated that *Smith appeared and denied wrongdoing* (9/14, p. 6).

22. The court therefore concludes that the only publicly disseminated information available through the media about Smith's SCI appearance was (1) the fact of his appearance; and (2) his denials of criminal activity.

23. One highly publicized witness at the SCI hearings was Charles H. Allen, who testified on December 11, 1980 (9/13, p. 29; Defense Exhibits 15, 17, 24, 26 and 28). Allen drew the media's attention because he testified behind a bulletproof glass panel while wearing a black hood (Defense Exhibit 15). The media reported that Allen testified that Smith associated with organized crime figures and participated in illegal activities in connection with labor unions and the administration of dental plans (*Id.*).

24. Allen was questioned at the SCI by Charles Blumenstein, Esquire ("Blumenstein"), an SCI attorney (9/7, p. 4). His questions were based on internal SCI memoranda (9/7, p. 5) and on information provided for him by SCI Special Agents Francis Betzler ("Betzler") and Kurt Schmidt ("Schmidt") (9/7, p. 8) which was not derived from Smith's immunized testimony (9/20, pp. 18–20, 28). Blumenstein was not present at the SCI when Smith testified, was not aware of the substance of Smith's testimony, and did not base any of his questions on Smith's immunized testimony (9/7, p. 6).

25. The Court finds that the questioning of Allen and the ensuing publicity in no way taints the prosecution of Smith, since it does not in any way derive from Smith's immunized testimony.

**THE CAMDEN INVESTIGATION**

26. George E. Wilson ("Wilson") is a special attorney with the Camden Field Office of the Newark, New Jersey Strike Force of the United States Department of Justice (8/3, p. 112).

27. The Camden Field Office of the Newark Strike Force began an investigation of Smith in early 1982 (8/31, p. 113). The Smith investigation had been transferred to Camden by United States District Judge J. William Ditter, Jr., of the Eastern District of Pennsylvania in February 1982 (*Id.*)

28. In addition to Wilson, who directed the investigation, four other investigators in Camden worked on the Smith investigation. These were Fredric Knapp ("Knapp"), a Deputy Attorney General of New Jersey assigned to the Strike Force Field Office in Camden (8/22, p. 125);[10] Karen Connelly, a special agent of the United States Department of Labor (8/30, p. 38); Stanley Lipski, a Detective Sergeant with the New Jersey State Police (8/30, p. 136); and Richard Joseph Watson, a Special Agent with the United States Department of Labor (8/31, p. 87). All of these individuals will be collectively referred to as the "Camden investigators."

---

**10.** Each of these investigators testified and were cross-examined about their activities in connection with the Camden-based investigation of the defendant. Their testimony begins on the date and page indicated.

29. When Wilson began working on the Smith investigation he was aware that Smith had previously testified before the SCI but did not know the substance of Smith's testimony (8/31, p. 114). He knew that a *Kastigar* hearing would be necessary if an indictment was ultimately returned by a grand jury in Camden (8/31, p. 115).

30. Wilson explained to the other Camden investigators the implications of *Kastigar* and ordered them not to make any use or derivative use of any information about Smith from the SCI (8/22, pp. 127, 135; 8/31, pp. 115–16). He instructed them not to read or listen to any media reports on Smith's immunized testimony (8/30, pp. 41, 138).

31. At various times during the Smith investigation Wilson reiterated his instructions to the other Camden investigators not to have any contact with Smith's immunized testimony at the SCI (8/31, p. 116).

32. The Camden investigators followed Smith's instructions and did not discuss Smith with SCI investigators, never received any information about Smith's immunized testimony, and did not see or hear any media reports about Smith at the SCI (8/30, pp. 44–45, 140; 8/31, pp. 31, 91).

33. Knapp began the Camden investigation of Smith by reviewing the transcript of grand jury proceedings that had been transferred to Camden from the Eastern District of Pennsylvania (8/22, p. 135).

34. Knapp then began issuing a series of subpoenas in connection with the Camden grand jury investigation. At the hearing Knapp detailed the subject of each of these subpoenas and explained how he came to the decision to issue the subpoena (8/22, p. 136—8/25, p. 35).

35. Knapp took no steps in his investigation of Smith and in the issuance of the subpoenas based on Smith's immunized testimony (*Id.;* 8/25, p. 42).

36. Based on the information presented by Knapp on direct and cross-examination, the court finds that Knapp's decision to issue the subpoenas in connection with the Camden grand jury investigation of Smith was based either (1) on information obtained through the earlier work of the Philadelphia investigators; or (2) through independent research and investigation by the Camden investigators. The court finds that the information obtained in the Camden grand jury investigation of the defendant is in no respect derived from Smith's immunized testimony before the SCI (*Id.*).

37. Wilson will be acting as the trial attorney in this case. He testified extensively about the Camden-based investigation of the defendant, his instructions to the other Camden investigators about possible *Kastigar* problems and how to avoid such problems, about his supervision of the Camden investigators, his analysis and choice of evidence to be presented at trial, and his selection of witnesses to testify at trial (8/31, p. 112—9/6, p. 157).

38. Wilson presented for the court's inspection the evidence that he planned to introduce at trial. For each item to be introduced into evidence, Wilson (a) identified and explained the evidence; (b) identified the source of that evidence; (c) named the witness who would identify and explain the evidence at trial; (d) explained the time at which he made the determination that the evidence would be useful at trial; and (e) explained the basis of his decision that the particular evidence should be introduced at trial (8/31, p. 121—9/1, p. 18).

39. After carefully examining the evidence proffered by Wilson as evidence to be used at trial, and considering Wilson's testimony on direct and cross examination, the court finds that the evidence the government will introduce at trial ultimately derives from one of three sources: (1) the United States Department of Labor; (2) the investigation and research of the Philadelphia investigators, and the subpoenas which had been issued on behalf of the federal grand jury sitting in the Eastern District of Pennsylvania until February 1982; and (3) the independent investigation and research of the Camden investigators and the subpoenas that had been issued on behalf of the grand jury sitting in Camden

after the transfer of this case from the Eastern District of Pennsylvania (*Id.*). The court therefore concludes that the evidence to be used at trial does not derive in any respect from Smith's immunized testimony.

40. None of Wilson's decisions in preparing this case for trial could have been based on the substance of Smith's immunized testimony, as he has never learned the substance of that testimony (8/31, p. 114). His knowledge of the fact that Smith had testified did not in any respect influence his preparation of this case for trial or increase his confidence in obtaining a conviction (8/31, pp. 115–17).

41. Wilson also outlined in detail the witnesses to be called at trial. He (a) named and identified each prospective witness; (b) explained the substance of their testimony; (c) named the exhibits (if any) that the witnesses would identify and on which their testimony would be based; (d) explained the point at which he determined that their testimony would be useful; (e) explained how he arrived at the decision that their testimony would be useful; and (f) explained what knowledge (if any) the witnesses had of Smith's immunized testimony (9/1, p. 29—9/2, p. 74).

42. In summary [11] the witnesses proposed to be presented at trial by the government are:

a. Virginia Bartlett and John Leroy Keane, United States Department of Labor employees, who will provide background information about E.R.I.S.A. and employee benefit plans (9/1, pp. 40–47);

b. Edward Baron, the President of Capital Life Insurance, who will provide information about Capital Life's first contacts with Steven Montrose, Stanley Soboloski and the defendant, beginning in 1973 (9/1, pp. 48–51);

c. Forest Cooper, a Vice-President of Capital Life, will testify about the financial relationship between Smith and Capital Life, and of Smith's bringing business to Capital Life in return for future commissions (9/1, pp. 57–79);

d. Gerry Stoval, another Capital Life employee, will explain certain aspects of Capital Life's financial operation (9/1, pp. 79–86);

e. Elaine Kanuch, an Assistant Vice-President at Capital Life, will testify about certain aspects of Capital Life's business practices (9/1, pp. 79–86);

f. Alvin Porter will provide historical information about Severance Administrators, one of the defendant's closely held corporations (9/2, pp. 89–96);

g. Stanford Frank, Raymond Kasser and Vincent Improto, all past or present officials of Teamsters Local 830 or the Local 830 Severance Fund, will testify about Smith's activities as a consultant to their fund (9/1, pp. 96–111);

h. Joseph Merbach and Joseph Hurwitz, former trustees of the Local 286 Severance Fund, will testify that they were unaware of Smith's dual relationship

---

**11.** The court will not, of course, try to restate all of the information provided by Wilson about the witnesses to be called at trial, and the court's summary in the text is not intended in any way to limit the testimony to be presented at trial.

Defense counsel objected at the hearing to Wilson being permitted to testify about the prospective witnesses, their testimony and their access to Smith's immunized testimony. Counsel argued that each prospective witness must be called at the *Kastigar* hearing to be cross-examined. The court rejects this argument. The focus of a *Kastigar* hearing is necessarily on the federal investigators and prosecutors and the question of their use or derivative use of defendant's immunized testimony. All of the federal officials who have participated in the six-year investigation of the defendant have testified and

have been fully cross-examined. The court has learned the entire history of the investigation of Smith by federal authorities, and of the steps they have taken to insulate their investigation from that of the SCI after June 5, 1980. The court has before it the information it needs to address the issues raised by *Kastigar*.

If at trial a question arises about the exposure of a given witness to Smith's immunized testimony the court can excuse the jury and conduct a voir dire of the witness to determine whether he or she has been exposed to this testimony. If the court finds that the witness's testimony is somehow tainted, that testimony will not be allowed. Given the adequate record that has been developed at this hearing, calling in each of the prospective witnesses would unjustifiably delay this proceeding.

with this severance fund and with Capital Life (9/2, pp. 9–19);

i. Patrick G. Welsh, a former administrator of the Local 286 Severance Fund, will testify about his dealings with Smith between 1974 and 1976 (9/2, pp. 5–8);

j. Richard Ferst, a Local 286 Severance Fund accountant, will testify that he was unaware of Smith's relationship with Capital Life (9/2, pp. 20–23);

k. Gary Perez, Michael Stafford and Richard Kenny, all associated with the Local 170 Severance Fund, will testify that they were unaware of Smith's dual relationship with their severance fund and with Capital Life (9/2, pp. 22–62);

l. John Greely and Bernard Czekaj, both associated with the Local 676 Severance Fund, will testify that they were unaware of Smith's dual relationship with their severance fund and with Capital Life (9/2, pp. 37–45);

m. Alvin Epstein and Marian Connor, both associated with the Local 1034 Severance Fund, will testify that they were unaware of Smith's dual relationship with their severance fund and with Capital Life (9/2, pp. 49–51);

n. James Shetterly, former general counsel to Capital Life, will testify about his view in 1974 about the severance plan proposed to Capital Life by Montrose and Soboloski (9/2, pp. 51–54);

o. Charles Buell, former chief actuary at Capital Life, will testify about the financial advisability of certain plans adopted by Capital Life in 1973 and 1974 (9/2, pp. 56–58);

p. Melvin Engeman, currently an actuary at Capital Life, will testify that he determined in 1978 that the profits being derived by Capital Life from the severance plans were unsatisfactory (9/2, pp. 58–63);

q. Mathias Erieg, Vice-President of Walter I. Segull Company, will testify that the insurance plans being provided by Capital Life to the severance plans were expensive, as compared to other available plans (9/2, pp. 70–74);

r. William Scheel, a professor at the University of Connecticut, will present a report showing that the severance funds have paid over $2,000,000 more than they should have because of the type of insurance plans they purchased through the defendant (9/2, pp. 64–70); and

s. Charles Allen and Albert Augustein will testify about Smith's association with organized crime figures (9/2, pp. 70–74).

43. Wilson chose these witnesses during the summer of 1983 as part of his preparation for trial (9/2, pp. 33–36). Wilson does not know the substance of Smith's testimony (8/31, p. 117) and the knowledge that Smith testified before the SCI has not led Wilson to any decisions in connection with this trial (8/31, pp. 36–38). The court concludes that Wilson's decision to call these witnesses at trial does not in any respect derive from Smith's immunized testimony.

44. Some of the witnesses to be called at trial are aware that Smith had testified at some point before the SCI or had read a newspaper article that mentioned Smith's appearance (9/1, pp. 87, 110; 9/2, pp. 14, 30, 49; 9/6, pp. 14, 83). As found earlier, however, the media coverage of Smith's testimony revealed only (1) the fact that he testified; and (2) his denials of criminal involvement (Findings of Fact # 20–# 22).

45. McLaughlin, a Philadelphia investigator, observed an article about the SCI investigation, but cannot remember whether he read it (8/19, p. 56). Knapp read an article about the SCI investigation that stated that Smith had testified (8/29, pp. 7–8). Knapp already knew that Smith had testified (8/29, p. 8). In any event, as noted repeatedly above, the media coverage of Smith's testimony revealed only (1) the fact that he testified; and (2) his denials of criminal involvement (Findings of Fact # 20–# 22).

46. The court has fully considered the testimony of the defense witnesses, including Libby Kolman, Smith's former secretary and longstanding friend (9/13, pp. 9–65, 74–149; 9/14, pp. 3–17); Donald Manno,

Kolman's attorney (9/12, pp. 10–75; 9/13, pp. 65–74); Edward McBride, Richard Kenney and Michael Stafford, former trustees of the Local 170 Severance Fund (9/14, pp. 17–107); Morris Pinsky, Smith's attorney before the SCI (9/15, pp. 3–113); David Luthman, an attorney with the law firm of Toll, Forkin, Sullivan & Luthman (9/15, pp. 117–45; 9/19, pp. 23–29); and Peter Stern, an attorney for the Local 286 Severance Fund (9/19, pp. 29–46). Nothing in the testimony of these or any other witnesses has persuaded the court that Smith's immunized testimony is being used or has ever been used by federal investigators, or that this case is in any way tainted by the immunized testimony.

The following Conclusions of Law, insofar as they may also be considered Findings of Fact, are so found by this court to be true in all respects.

## CONCLUSIONS OF LAW

1. The government has the burden of proving by clear and convincing evidence that the evidence to be presented at trial was derived from sources totally independent of the defendant's immunized testimony and that this testimony has not been used by the government in any respect. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *United States v. Semkiw*, 712 F.2d 891 (3rd Cir. 1983); *United States v. Hossbach*, 518 F.Supp. 759, 772 (E.D.Pa.1980).

2. To meet this burden, the court required the government (1) to fully document the sources of its evidence to show that its case against the defendant derives from sources totally independent of the defendant's immunized testimony; and (2) to show that the federal government's investigation was insulated from the SCI investigation from the moment Smith was

immunized until the present time. *United States v. Semkiw, supra.*

3. The requirements of *Kastigar* are not intended to be an insurmountable obstacle for federal prosecutors. A defendant may be prosecuted and convicted for illegal conduct, even if that conduct has been the subject of prior immunized testimony, so long as federal authorities do not use the immunized testimony in any way and the defendant is left in substantially the same position as if he had remained silent in the absence of a state grant of immunity. *Pillsbury Co. v. Conboy*, —— U.S. ——, 103 S.Ct. 608, 613, 74 L.Ed.2d 430 (1983); *United States v. Pantone*, 634 F.2d 716, 719 (3rd Cir.1980).

4. Knowledge by some of the federal authorities and prospective witnesses that the defendant had previously been immunized and denied wrongdoing cannot be said to taint this prosecution. To conclude otherwise would create an insurmountable barrier to the prosecution of this defendant, *Pantone, supra*, even though he has been left in substantially the same position as if he had remained silent in the absence of the grant of immunity. *Conboy, supra.*

5. The government has demonstrated by clear and convincing evidence that the evidence to be used at trial is derived from sources totally independent of Smith's immunized testimony, and that it has not used that immunized testimony in any respect.

6. The government has demonstrated by clear and convincing evidence that its investigation was insulated from the SCI investigation from the moment Smith was immunized until the present time.

7. The court therefore concludes that this prosecution is not tainted in any respect by the use of defendant's immunized testimony.[12]

---

12. The court has fully considered defendant's post-hearing submission which argues, of course, that this prosecution is somehow tainted by the defendant's prior immunized testimony. The court finds the defendant's conjectural suggestions of taint to be creative but unsupported in the record. *Kastigar* does not require the court to engage in endless speculation. Rather, it requires the court to make a reasoned decision based on the hearing record as to whether the government is benefitting in any respect from the defendant's immunized testimony. After carefully considering that record in light of the strict standards set forth in this opinion, the court finds that no taint exists and that this case may proceed.

8. Defendant's motion for an order dismissing the indictment or in the alternative suppressing improperly obtained evidence will be denied.

9. An appropriate order will be entered.